

**IN THE COURT OF CRIMINAL APPEALS
OF TEXAS**

**NO. PD 1929-06**

**STEPHON LAVELLE WALTER, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE SIXTH COURT OF APPEALS
BOWIE COUNTY**

COCHRAN, J., delivered the opinion of the Court, in which PRICE, WOMACK, JOHNSON and HOLCOMB, JJ., joined. MEYERS, J., concurred in the result. HERVEY, J., filed a dissenting opinion in which, KELLER, P.J. and KEASLER, J., joined.

O P I N I O N

During the early morning hours of September 1, 2003, the bodies of three employees were found inside a small office of the Outback Steakhouse in Texarkana. Each had been shot. Approximately $800 was taken. A jury convicted appellant of these capital murders and sentenced him to life imprisonment. During trial, Roderick Henson testified about a conversation he had with his brother Markel,[1] appellant's co-defendant. Markel's statements

_____

[1] Markel's name is spelled various ways. We use the court reporter's spelling.

to his brother implicated both himself and appellant in the robbery-murders, but placed the blame for killing the three victims solely on appellant. The trial judge admitted all of Markel's statements under the hearsay exception for statements against penal interest[2] because they implicated him in the capital murder. The court of appeals affirmed this ruling, noting also that the record provided "significant corroboration" indicating the trustworthiness of Markel's statements to his brother.[3]

We granted review to determine whether the entire conversation was admissible as a statement against interest under Texas Rule of Evidence 803(24) or only those specific portions that were actually against Markel's penal interest.[4] We conclude that only those

---

[2] T EX. R. EVID. 803(24). Rule 803(24) reads,
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . .
(24) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

[3] *Walter v. State*, 209 S.W.3d 722, 731 (Tex. App.–Texarkana 2006).

[4] We granted review of appellant's ground one:
In determining that an accomplice's statement against penal interest made to his brother was a firmly rooted exception to the hearsay rule and was sufficiently self-inculpatory, the Sixth Court of Appeals' reliance on *Dewberry v. State* was improper in light of the Court of Criminal Appeals' opinion in *Guidry v. State* and the United States Supreme Court's opinion in *Lilly v. Virginia*.

statements that are directly against the speaker's penal interest (including "blame-sharing" statements) are admissible under Rule 803(24). Self-exculpatory statements that shift blame to another must be excluded. The rule requires courts to separate the dross of blame-shifting statements from the gold of self-inculpatory and blame-sharing statements, admitting only the latter. We therefore reverse and remand the case to the court of appeals for a harm analysis.

## I.

On August 31, 2003, the last night of his vacation, Matt Hines, the proprietor of the Texarkana Outback, drove to the restaurant to help Rebecca Shifflet, the general manager, and Crystal Willis, the assistant manager, do the end-of-the-month inventory. Around 12:30 a.m., Matt's wife, Toni Hines, called his cell phone to check up on him. There was no answer. She tried the restaurant. No answer. She began to get worried, made several more unanswered calls to Matt, and finally drove to the restaurant. "All the lights were still on and all the blinds were open, and [she] knew that wasn't right." After knocking on the door, honking her horn, and trying to call Ms. Shifflet, Toni called 911.

The police responded. After finding another employee who had keys, they entered the restaurant. Everything appeared normal. Then someone looked in the small back office and saw three bodies lying on the bloody floor. All had been shot in the head.

The following morning, Markel Henson told his older brother, Roderick, that he was "involved" in what had happened at the Outback. Markel was nervous, but he wanted his

brother's help in burning the clothes that he had worn the night before. He told Roderick how he and appellant had planned to rob the restaurant–at which both had previously worked but had been fired–and then carried out that plan. After hearing his younger brother's story, Roderick helped Markel burn the clothes, and he stored the money that Markel gave him in a closet. After several days of asking Markel to turn himself in, Roderick told his wife to call the police. Roderick then told the police what Markel had told him. Markel and appellant were soon charged with capital murder.

Shortly after Roderick began testifying in the State's case-in-chief, the defense objected and requested a hearing outside the presence of the jury. Appellant's counsel argued that while Roderick should be allowed to relate Markel's self-inculpatory statements because they were against Markel's penal interest, he should not be allowed to relate Markel's statements that inculpated only appellant. Counsel said that those hearsay statements were an attempt to shift blame to appellant and minimize Markel's involvement.

Before ruling on the admissibility of these statements, the trial judge heard Roderick's proposed testimony outside the presence of the jury. Roderick stated that Markel had privately come to him the day after the murders asking for his help. Markel said that he and appellant "went to [the] Outback to hit a lick," which, to Roderick, meant to "make some money, I guess, rob. . . . And he told me that [appellant] went in the office and got the money, and came back and gave him the bag of money, and went back in the office. And I guess he was trying to get the key to the safe. And then he told me he heard six gunshots,

and, basically, that's about it."  Markel "said he was standing in the hallway when appellant

went to the office."  Markel told Roderick that he heard people begging for their lives; he

heard screams.  Someone called appellant by his first name, "Stephon, please don't shoot

me," and "Please don't kill us."   Markel said that they planned to get the money out of the

safe, but they couldn't find the key to it.  They left and drove back to appellant's apartment

complex where they split the money, about $400.00 each.  Markel also told Roderick that

appellant put a gun to his head and threatened to kill him if he told anyone.

After brief arguments by counsel, the trial judge ruled that the entire conversation

between Markel and Roderick was admissible as a statement against Markel's interest

because Markel had implicated himself in the capital murders.[5]

---

[5] The trial judge explained,
>    The case law seems to me makes the distinction between statements where
> the declarant is minimizing his culpability.  I suppose the statements where the
> declarant is connecting themselves with an offense, it also connects the defendant.
> In other words, if the declarant makes a statement to the effect that, 'We were
> going to the place to rob it and the defendant killed someone,' and the declarant's
> statement is such that it would tend to make them guilty of a lesser offense, such
> as robbery, then it's not admissible against the co-defendant at the co-defendant's
> trial.
>    But if the declarant makes a statement to the effect that 'We were going to
> the place to rob it and we killed the people,' then that's more in the nature of a
> statement that makes the declarant guilty of the higher offense, in the fact that it
> also makes the co-defendant hyper-guilty of that same offense, is sufficient to
> allow it to come in under the exception for statements against penal interest.
> In reviewing the statement from Mr. [Roderick] Henson about his brother
> [Markel], under Section 7.02 of the Texas [Penal Code], the section regarding
> criminal responsibility for the conduct of another, the statements made by the
> defendant, Markel [sic] Henson, Richard Henson would be one, if taken by itself,
> looking at the statement by itself, would be a statement that would make him
> liable for the offense of capital murder if you look at the offense of parties.
>    . . .

With the jury present, Roderick testified that he had a conversation with his brother in Markel's bedroom the Monday morning after the Sunday-night robbery. Roderick said Markel was nervous. He then repeated the above statements, explaining how Markel said that he was standing in a hallway while appellant went into the office, returned with a bag of money, and then, after appellant returned to the office, Markel heard six shots. Roderick testified that, after this conversation, they gathered up Markel's clothes, left Markel's house, and went to Roderick's house where they burned the clothes in a backyard barbecue.[6]

Later in the trial, appellant's mother testified that appellant had told her that he was "the mastermind" behind the robbery at the Outback.

Appellant's brother-in-law, Billy Ray Johnson, testified that appellant came to him the day before the robbery and asked him for a gun. Billy Ray gave him a .380 caliber

---

It seems to me that if you take [Markel's] statement when it was made, it was made at a time, the day after the robbery, this was before the time the witness, Roderick Henson, hired any attorney, it was made before any negotiations were made between the State and [Markel], if they have occurred, that at the time the statement was made, it was clearly a statement which made [Markel] liable for the offense of capital murder, particularly under the law of parties. So the fact that the statement was made made him liable for the offense of capital murder means that the statement does not tend to negate his culpability and shift that onto someone else. It essentially makes him liable for the same offense that he's saying that the defendant is liable for. So on that basis, I find that the testimony from Mr. Henson meets the exception, the hearsay exception, under Rule 803 for statements made against penal interest. At the time it was made, it was a statement against penal interest and it was a statement that implicated him in the capital murder offense, which is the same offense that the defendant is on trial for. So on the basis of that, I find that the statement is admissible and I overrule the objection.

[6] Roderick then identified photographs of the backyard barbecue pit showing the ashes of the burned clothes.

handgun.[7]  Later that day, appellant told Billy Ray "that he should do Outback," meaning "rob the place."  Still later, appellant again said that he "should do Outback" with the borrowed gun.

Billy Ray then related another conversation he had with appellant immediately after the Outback robbery. Appellant came to Billy Ray's bedroom and nervously "explained to me that he had robbed and killed someone at Outback.  He had said he had robbed and killed someone at Outback. . . . I believe he said three had got killed."  Appellant said Markel went with him.  Billy Ray thought appellant was serious "because of the way [he] was looking."  Billy Ray told appellant that he should have killed Markel to ensure that he wouldn't talk.

Appellant testified and admitted talking to Markel that night, checking to see "if he was going to hang out with me, come to the house and watch a couple movies."  He said that he and Markel talked about doing something illegal that night and that Markel asked for a gun.  Appellant went to Billy Ray's to get a gun for Markel and borrowed it because he was "just helping somebody out."  He denied going to the Outback that night.

The jury found appellant guilty and sentenced him to life imprisonment.  On appeal, appellant claimed that the trial court erred by not excluding Roderick's testimony about Markel's statements both under the hearsay rule and under the Confrontation Clause.

The court of appeals addressed both of these claims.  It concluded that Markel's statements were not testimonial because they were made during a spontaneous conversation

---

[7] The Outback murder weapon was never recovered.  Billy Ray and appellant's mother destroyed a gun that they found in appellant's apartment after the robbery.

between the two brothers as Markel attempted to obtain his brother's help in eluding identification.[8]  Because the statements were nontestimonial, the Confrontation Clause did not necessarily bar their admission.[9]  The court then turned to the evidentiary issue of whether the statements were admissible under Rule 803(24), the hearsay exception for statements against penal interest.  The court of appeals found that the statements were sufficiently self-inculpatory because they tended to subject Markel to the same criminal liability as appellant, even though Markel's "statements seem to depict him as the less culpable one[.]" [10]  Assessing the six factors listed in *Dewberry v. State*,[11] the court explained how "the record provides significant corroboration that clearly indicates the trustworthiness of [Markel's] statements to his brother."[12]  Because Markel's statements were both sufficiently self-inculpatory and trustworthy, based upon corroborating circumstances, the

---

[8]  *Walter v. State*, 209 S.W.3d 722, 728 (Tex. App.–Texarkana 2006).

[9]  *Id*. at 728-29; *see Crawford v. Washington*, 541 U.S. 36 (2004); *Davis v. Washington*, 547 U.S. 813 (2006).  The court of appeals further analyzed appellant's Confrontation Clause claim under *Ohio v. Roberts*, 448 U.S. 56 (1980), to assess whether Markel's hearsay statement "had sufficient indicia of reliability."  209 S.W.3d at 729.  The Supreme Court explicitly overruled *Ohio v. Roberts* in *Crawford* and *Davis*.  *See Davis*, 547 U.S. at 825 n.4 ("*Roberts* condition[ed] the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.' We overruled *Roberts* in *Crawford* by restoring the unavailability and cross-examination requirements") (internal quotations and citations omitted).

[10]  209 S.W.3d at 729

[11]  4 S.W.2d 735, 751 (Tex. Crim. App. 1999) (citing *Bingham v. State*, 987 S.W.2d 54, 58 (Tex. Crim. App. 1999)

[12]  *Walter*, 209 S.W.3d at 731.

court of appeals concluded that the trial judge properly admitted all of them.[13]

## II.

Generally speaking, the hearsay rule excludes any out-of-court statement offered to prove the truth of the matter asserted.[14] But, like most rules, this one has exceptions, twenty-seven explicit exceptions, as well as numerous exemptions that are defined out of the rule.[15] The twenty-seven exceptions stem from the notion that the four hearsay dangers of faulty perception, faulty memory, miscommunication, and insincerity are either absent or minimal in certain situations.    Statements made in these situations or under the specified circumstances carry such sufficient, independent, circumstantial guarantees of trustworthiness that the rule deems cross-examination unnecessary.[16] These are gold-standard statements. Of the twenty-four exceptions listed under Rule 803, most can be categorized as unreflective statements, reliable documents, or reputation evidence.[17] They involve situations in which people normally would not have the opportunity or motive to

---

[13] *Id*.

[14] TEX. R. EVID. 802; TEX. R. EVID. 801(d).

[15] *See* TEX. R. EVID. 803 (listing twenty-four exceptions to the hearsay rule, when the hearsay declarant's availability is immaterial); TEX. R. EVID. 804 (listing three exceptions to the hearsay rule when the declarant is unavailable); TEX. R. EVID. 801(e) (defining statements that are not hearsay).

[16] *See Williamson v. United States*, 512 U.S. 594, 598 (1994).

[17] *See Fischer v. State*, 252 S.W.3d 375, 379 (Tex. Crim. App. 2008).

create a falsehood or shade the truth.[18]   The last exception under Rule 803, the one for

statements against interest is, however, based upon a somewhat different rationale.[19]

The exception for statements against pecuniary, penal, or social interest stems from

the commonsense notion that people ordinarily do not say things that are damaging to

themselves unless they believe they are true.[20]  Thus, a reasonable person would not normally

claim that he committed a crime, unless it were true.[21]  This is the guiding principle behind

both the Texas and federal hearsay exceptions for statements against penal interest.[22]

---

[18]  *See id.* at 378-381.

[19]  *See Lilly v. Virginia*, 527 U.S. 116, 126-27 (1999) ("The 'against penal interest' exception to the hearsay rule–unlike other previously recognized firmly rooted exceptions–is not generally based on the maxim that statements made without a motive to reflect on the legal consequences of one's statement, and in situations that are exceptionally conducive to veracity, lack the dangers of inaccuracy that typically accompany hearsay. The exception, rather, is founded on the broad assumption 'that a person is unlikely to fabricate a statement against his own interest at the time it is made.'") (internal citation omitted).

[20]  *Williamson*, 512 U.S. at 599 (discussing the federal counterpart to the Texas exception for statements against penal interest and noting that "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.").

[21]  *See United States v. Watson*, 525 F.3d 583, 586 (7th Cir. 2008), *pet. for cert. filed* (U.S. Aug. 6, 2008)(No. 08-5683) ("Most people would not say that they knocked over a bank, spit on a policeman, or shoved their mother if it wasn't true.")

[22]  Although the Supreme Court, in *Williamson*, spoke of the exception for statements against penal interest found in the Federal Rules of Evidence, the federal and Texas exceptions are quite similar.  We find federal case law on the topic persuasive, unless dealing with one of the few differences between those exceptions.  *See Cofield v. State*, 891 S.W.2d 952, 956 (Tex. Crim. App. 1994) ("Though the Supreme Court in *Williamson* was interpreting the federal rule, our Rule 803(24) contains very similar language, and we find the Supreme Court's reasoning and analysis persuasive.").

The rule sets out a two-step foundation requirement for admissibility.[23] First, the trial court must determine whether the statement, considering all the circumstances,[24] subjects the declarant to criminal liability[25] and whether the declarant realized this when he made that statement.[26] Second, the court must determine whether there are sufficient corroborating

---

[23] *Dewberry*, 4 S.W.3d at 751; *Bingham*, 987 S.W.2d at 57.

[24] *See Williamson*, 512 U.S. at 603-604. As the Supreme Court explained, [W]hether a statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest. "I hid the gun in Joe's apartment" may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory. "Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest. The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.

[25] *Dewberry*, 4 S.W.3d at 751; *Bingham*, 987 S.W.2d at 57 ("First, the trial court must determine whether the statement in question tends to expose the declarant to criminal liability."); *Miles v. State*, 918 S.W.2d 511, 515 (Tex. Crim. App. 1996) (when declarant was only present and didn't participate, statement does not produce criminal liability and thus is not admissible); *Simpson v. State*, 119 S.W.3d 262, 269 (Tex. Crim. App. 2003) (declarant "did not implicate herself at all except to suggest her presence by saying that 'they' went to the river. This is not enough to render the statements sufficiently against her interest to be reliable. Therefore, the statements made by Jennifer that were against the appellant's interest were not admissible under Rule 803(24).").

[26] If the declarant does not recognize the disserving nature of his statement when it is made, his statement indicates ignorance, not trustworthiness; such statements are not admissible. *See United States v. Palumbo*, 639 F.2d 123, 127-28 (3rd Cir. 1981) (although technically declarant's statement to arresting officer who had found cocaine on her person might tend to show a conspiracy between herself and defendant, she may not have understood the legal implications of her statement); *see also United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987) (woman's statement that she and defendant were on honeymoon trip did not fit

circumstances that clearly indicate the trustworthiness of the statement.[27]

Statements against penal interest fall into three general categories:    Some inculpate

only the declarant (*e.g.*, "I killed Joe.");[28] others inculpate equally both the declarant and a

third party, such as a co-defendant (*e.g.*, "We killed Joe.");[29] still others inculpate both the

declarant and third party, but also shift blame by minimizing the speaker's culpability (*e.g.*,

---

exception because there was no evidence that she was "in any manner aware" that what she said was against her penal interest); *see generally,* 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 496 at 813-15 (2d ed. 1994) ("the required understanding of interest is framed in objective terms: Would a reasonable person have understood that what he said was against his interest?  The aim is to know how the speaker conceived his interests, but, absent better evidence, the court may attribute to him the interests a reasonable person in his situation would have.") (footnote omitted); STEPHEN A. SALTZBURG & KENNETH R. REDDEN, FEDERAL RULES OF EVIDENCE MANUAL at 940 (4th ed. 1986) ("Whenever a statement against interest is offered, it is the job of the Trial Judge to determine whether the declarant was under the impression that the statement was against his interest at the time he made it.").

[27] *Dewberry*, 4 S.W.3d at 751; *Bingham,* 987 S.W.2d at 57; *Davis v. State*, 872 S.W.2d 743, 748-49 (Tex. Crim. App. 1994) ("The corroborating circumstances must be sufficiently convincing to 'clearly indicate the trustworthiness of the statement.' The focus of this inquiry is on verifying to the greatest extent possible the trustworthiness of the statement so as to avoid the admissibility of a fabrication."); *Lester v. State*, 120 S.W.3d 897, 901 (Tex. App.–Texarkana 2003, no pet.) ("The structure of the rule and its wording demonstrate the obvious suspicion with which the drafters of the rule regarded a statement exposing the declarant to criminal liability, but exculpating the accused. The requirement of corroboration is therefore construed in such a manner as to effectuate its purpose of circumventing fabrication."); *see generally United States v. Amerson*, 185 F.3d 676, 691 (7th Cir. 1999) (Posner, C.J., dissenting) (discussing rationale for requiring corroboration).

[28] This type includes confessions.  *Woods v. State*, 152 S.W.3d 105, 122 (Tex. Crim. App. 2004) ("A confession is a statement against penal interest, and it is viewed as reliable.") (Womack, J., dissenting).

[29] An admission against a co-defendant declarant's interest can be admissible against the defendant so long as it is also sufficiently against the declarant's interest to be reliable. *See Dewberry*, 4 S.W.3d at 751 (citing *Williamson*, 512 U.S. at 603).

"We robbed the bank, and Dan killed Joe, the bank teller.").[30]  A confession, conversation

or narrative, even a short one, might mix together all three types of statements.

When an extended narrative contains statements that inculpate both the declarant and

a third person, the application of the exception is not obvious. The question becomes:  How

much dross may accompany the gold of the purely self-inculpatory statements?[31]

In *Williamson v. United States*,[32] the Supreme Court addressed precisely this question

in a fractured set of opinions.  In that case, a Florida deputy sheriff stopped a rental car for

---

[30]  *Lilly v. Virginia.*, 527 U.S. at 120-21, 138-39 (statements in which the declarant implicated himself and two others in a felony-murder, but in which he said that one of co-defendants was the mastermind and another was the trigger-man, held inadmissible as not under the against-penal-interest exception); *Guidry v. State*, 9 S.W.3d 133, 149 (Tex. Crim. App. 1999) ("While some of Prystash's statements refer to 'we,' meaning both himself and appellant, on the critical issue of who killed the victim, Prystash's statements inculpate appellant alone as the triggerman and describe with specificity how 'appellant' killed the victim.  Prystash told [the in-court witness] he just dropped appellant off at the victim's residence and picked him up after appellant had committed the murder.").

[31] This question has been the topic of a long-running scholarly debate.  Dean Wigmore expressed the most liberal viewpoint concerning the admissibility of collateral statements, those statements that do not directly inculpate the speaker.  He argued that "the statement may be accepted, not merely as to the specific fact against interest, but also as to every fact contained in the same statement" because the statement was made under circumstances indicating the speaker's sincerity and accuracy.  5 JOHN WIGMORE, EVIDENCE § 1465 at 271 (3d ed. 1940). Dean McCormick was more conservative: he would allow for the admission of neutral collateral statements such as the "blame-sharing" statements of "We killed Joe," but not self-exculpatory, "blame-shifting" statements such as "We robbed the bank, and Dan killed Joe, the bank teller." CHARLES MCCORMICK, LAW OF EVIDENCE § 256 at 552-53 (1954).  The most conservative position is that of Professor Jefferson who would exclude all collateral statements and admit only those words that are directly against the speaker's penal interest.  Bernard S. Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule*, 58 HARV. L. REV. 1, 62-63 (1944).

[32] 512 U.S. 594 (1994).

weaving on the highway.[33]    He found nineteen kilograms of cocaine in the car, and he

arrested the driver, Harris.[34]    Harris then told a DEA agent that he was only transporting the

drugs, which belonged to Williamson.[35]    Harris refused to testify at Williamson's trial, so the

trial court admitted Harris's prior statements into evidence as statements against interest.[36]

On appeal to the Supreme Court, the case turned on what is meant by the word "statement"

---

[33]  *Id.* at 596.

[34]  *Id.*

[35]  *Id.*

[36]  *Id.* at 597-98.  Although *Williamson* relies on FED. R. EVID. 804(b)(3), its Texas counterpart, TEX. R. EVID. 803(24), is quite similar.  The only significant difference is that the federal rule requires that the witness be unavailable before the hearsay statements are admissible; the Texas rule does not require unavailability.  *See* FED. R. EVID. 804(b)(3); TEX. R. EVID. 803(24).
     Although the federal rule does not explicitly say that statements against interest offered to *inculpate* a defendant are not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement, this requirement has been "written into" the rule by most federal courts.  *See United States* v. *Mendoza*, 85 F.3d 1347, 1351 (8th Cir. 1996); *United States* v. *Thomas*, 62 F.3d 1332, 1337 (11th Cir. 1995); *United States v. Harty*, 930 F.2d 1257, 1263 (7th Cir. 1991) (statements against interest implicating defendant must be accompanied by "corroborating circumstances" indicating trustworthiness; separate constitutional standard requires hearsay to be reliable by inherent trustworthiness); *United States v. Seeley*, 892 F.2d 1, 2 (1st Cir. 1989) (courts interpret exception as "implicitly imposing" corroboration requirement where government "uses the hearsay to inculpate"); *United States v. Boyce*, 849 F.2d 833, 835-37 (3d Cir. 1988); *United States* v. *Casamento*, 887 F.2d 1141, 1170 (2nd Cir. 1989); *United States v. Carvalho*, 742 F.2d 146, 150-51 (4th Cir. 1984); *United States* v. *Alvarez*, 584 F.2d 694, 701 (5th Cir. 1978).  These courts have stated that the corroboration requirement for inculpatory statements is necessary either under the Supreme Court's decision in *Williamson* or the constitutional right of confrontation.  Indeed, in *United States v. Sarmiento-Perez*, 633 F.2d 1092, 1098-1101 (5th Cir. 1981), the Fifth Circuit held that the Sixth Amendment right to confrontation requires more corroboration for third-party statements that inculpate the defendant than for statements exculpating him.

in the federal hearsay exception for a statement against penal interest.[37]  If "statement" is given a broad meaning, admissibility is determined by looking to how inculpatory the statement is as a whole; if it "sufficiently inculpates" the declarant, the entire narrative comes in.[38]  If, on the other hand, "statement" is given a narrow meaning, the hearsay exception would "cover only those declarations or remarks within the confession that are individually self-inculpatory."[39]  In choosing the more narrow definition, a majority of the Court stated,

> The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.[40]

In distinguishing between self-inculpatory remarks and those remarks that are collateral to the self-inculpatory ones, the majority explained,

> The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability. We see no reason why collateral statements, even ones that are neutral as to interest . . . should be treated any differently from other hearsay statements that are generally excluded.[41]

 The majority concluded that "the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader

---

[37]  *Williamson*, 512 U.S. at 599.

[38]  *Id*.

[39]  *Id*.

[40]  *Id*. at 599-600.

[41]  *Id*. at 600.

narrative that is generally self-inculpatory."[42] Thus, a trial court may not just assume that a particular statement is self-inculpatory merely because it is part of a fuller narrative that is, in its entirety, self-inculpatory.[43] The Supreme Court concluded that some of Harris's statements were admissible, such as when Harris said that he knew the suitcase contained cocaine,[44] but other statements, especially those that shifted blame to Williamson, were not.

Although all members of the Supreme Court agreed that at least some of Harris's statements were inadmissible, they disagreed upon which portions should be excluded. Four justices concluded that none of Harris's statements to the DEA agent should have been admitted because his "inculpatory statements are too closely intertwined with his self-serving declarations to be ranked as trustworthy."[45] Three others thought that only unreliable "blame-shifting" collateral statements should be excluded, while "blame-sharing" or neutral collateral statements should be admitted unless "the declarant had a significant motivation to obtain favorable treatment," in which case the entire statement should be inadmissible.[46] (Of course, in a post-*Crawford*, post-*Davis* world, all of Harris's custodial interrogation

---

[42] *Id.* at 600-01.

[43] *Id*. at 601 (citing *Lee v. Illinois*, 476 U.S. 530, 541 (1986)).

[44] *Id*. at 604.

[45] *Id.* at 608 (Ginsberg, J., joined by Blackmun, Stevens, and Souter, JJ., concurring). Furthermore, these four justices emphasized the inherent untrustworthiness of custodial statements implicating a third person: "A person arrested in incriminating circumstances has a strong incentive to shift blame or downplay his own role in comparison with that of others, in hopes of receiving a shorter sentence and leniency in exchange for cooperation." *Id.* at 607-08.

[46] *Id.* at 617-20 (Kennedy, J., joined by Rehnquist, C.J., and Thomas, J., concurring).

statements were testimonial and thus excludable under the Confrontation Clause unless

Williamson had had a prior opportunity to cross-examine Harris.[47])

This Court and other Texas courts have long followed the basic reasoning and analysis

in *Williamson* in addressing Texas Rule 803(24).[48]  In *Dewberry v. State*,[49] without explicitly

saying so, we followed the approach of Justice Kennedy's concurring opinion in upholding

the admission of both self-inculpatory statements and "blame-sharing" or neutral collateral

statements under Rule 803(24).[50]   In examining whether the "blame-sharing" statements

---

[47] *See Crawford v. Washington*, 541 U.S. 36 (2004); *Davis v. Washington*, 547 U.S. 813 (2006).  Thus, the Confrontation Clause analysis and discussion of statements against penal interest made to investigating police officers in *Lilly v. Virginia*, 527 U.S. 116 (1999), has been largely superseded by those two cases, although the reasoning in *Lilly* is consistent with that in both *Crawford* and *Davis*.

[48] *Cofield v. State*, 891 S.W.2d 952, 956 (Tex. Crim. App. 1994) ("we find the Supreme Court's reasoning and analysis [in *Williamson*] persuasive");  *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999) (citing and relying upon *Williamson* and concluding that cohort's statements that "we" committed certain criminal acts were sufficiently against the speaker's interest to be admissible under TEX. R. EVID. 803(24)); *Miles v. State*, 918 S.W.2d 511, 515 (Tex. Crim. App. 1996) (quoting *Williamson* and concluding that Rule 803(24) "'does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory'"); *see also Mendez v. State,* 56 S.W.3d 880, 887-90 (Tex. App.–Austin 2001, pet. ref'd) (explaining that a co-defendant's statement that is "broadly self-inculpatory may nevertheless be inadmissible if it is blame shifting" and that "even statements that expose the declarant to *potential* legal liability may be inadmissible if they incriminate the defendant to a greater degree") (emphasis in original); *Zarychta v. State,* 961 S.W.2d 455, 458-59 (Tex.App.–Houston [1st Dist.] 1997, pet. ref'd) (holding that an accomplice's attempt to shift blame was inadmissible under Rule 803(24) because it minimized the declarant's own role).

[49] 4 S.W.3d 735 (Tex. Crim. App. 1999).

[50]  In that case, Dewberry and his brother, co-defendant Chris, disposed of the victim's truck after committing capital murder. A man named Bilfafano had accompanied the brothers in his own truck to give them a ride back.  Bilfafano testified that Chris told him that "[w]e got this truck," "[w]e killed somebody," and "we had to tie him up." *Dewberry*, 4 S.W.3d at 748-50.  A second witness, Trevino, testified about statements Chris made to him and said that "Chris

were sufficiently self-inculpatory, we noted,

> The State was careful to elicit accounts only of statements made by [the declarant co-defendant] referring to 'we,' which included both him and appellant. An admission against a co-defendant declarant's interest can be admissible against the defendant so long as it is sufficiently against the declarant's interest to be reliable. . . . Because [the declarant's] statements containing 'we' implicated him in the capital murder . . ., this Court concludes that his statements were sufficiently self-inculpatory to be reliable under *Williamson* and *Cofield*.[51]

But in a separate capital-murder case, *Guidry v. State*,[52] decided two months later, we held

that "blame-shifting" statements that did not inculpate the speaker and the defendant *equally*

were inadmissible under the rule.[53] We stated,

---

always referred to 'we' when he discussed committing the instant offense. Chris told Trevino they had put a pillow over a guy's head and shot him." *Id.* at 750.  Chris spoke to a third witness, telling him how he and Dewberry shot the victim with a shotgun and dropped the victim's truck at "a shopping center somewhere in Vidor," how they put the pillow over the man's head before they shot him, and how they took "VCRs, presents, a gun. Some things." *Id.*

[51]  *Dewberry*, 4 S.W.3d at 751; *see also Cofield v. State*, 891 S.W.2d at 956; *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994) (admitting co-defendant Prater's statements against penal interest made to his girlfriend that inculpated himself and defendant equally; "the statements do not reflect any attempt by Prater to minimize his own culpability. Rather, Prater implicated himself in all aspects of the robbery. He admitted that he entered the bank, that he carried a gun, and that he went behind the counter to seize the money. Nor was there any effort to make Matthews seem more culpable than Prater. Prater said that Matthews had held a gun on the bank employees and patrons while Prater and the third robber went behind the counter. In every material detail of Prater's statement, Matthews and Prater were equally culpable. We see nothing in the contents of the statements or in the circumstances in which they were made to cause suspicion that only the portions of Prater's statements that dealt with his own actions were trustworthy.").

[52] 9 S.W.3d 133 (Tex. Crim. App. 1999).

[53] In this case, the defendant claimed that the trial court erred in admitting the testimony of Gipp, the girlfriend of co-defendant Prystash.  Gipp testified about statements Prystash made to her about his and Guidry's roles in the murder.  We agreed with the defendant that "the portions of Prystash's statements that implicated appellant [Guidry] were not admissible as

The statements made by Prystash [the declarant co-defendant] in the instant case are not so equally against both Prystash's and appellant's interests as reach this level of reliability.  While some of Prystash's statements refer to 'we,' meaning both himself and appellant, on the critical issue of who killed the victim, Prystash's statements inculpate appellant alone as the triggerman and describe with specificity how 'appellant' killed the victim.  Prystash told Gipp he just dropped appellant off at the victim's residence and picked him up after appellant had committed the murder. Granted both driver and triggerman bear potentially equal criminal liability, but the driver might be in a better bargaining position should he decide to cooperate with the State, and the driver might have a better chance at gaining sympathy from the jury.  Because Prystash's statements so clearly delineate his and appellant's roles on the critical issue of who killed the victim, we hold the statements made by Prystash which were against appellant's interest were not admissible under Rule 803(24).[54]

Our case law, like that of several other states,[55] reflects  a somewhat more permissive

approach to admitting statements against interest than the one announced by the two-justice

plurality in *Williamson*.  We therefore formally adopt Justice Kennedy's approach and that

---

statements against Prystash's interest."  9 S.W.3d at 148-49.  The exception does not include statements against a third party's interest "unless the statement against the third party's interest *is also* sufficiently against the declarant's interest[.]" *Id.* at 149.  Central to our analysis was that Prystash's statements minimized the degree of his participation in the capital murder, even though it did not absolve him of criminal liability for that offense.

[54]   *Guidry*, 9 S.W.3d at 149.

[55] *See, e.g., State v. Sonthikoumane*, 769 A.2d 330, 320-21 (N.H. 2002) (concluding that *Williamson* did not require change in state evidentiary law that had admitted collateral statements as well as purely self-inculpatory ones under hearsay exception for statements against interest); *People v. Beasley*, 609 N.W.2d 581, 583-84 (Mich. Ct. App. 2000) (same); *State v. Julian*, 719 N.E.2d 96, 100-01 (Ohio Ct. App. 1998); *People v. Newton*, 966 P.2d 563, 566 (Colo. 1998) (rejecting *Williamson* under state rule of evidence to the extent that it would exclude neutral collateral statements); *Chandler v. Commonwealth*, 455 S.E.2d 219, 225 (Va. 1995); *see also Jackson v. Renico*, 320 F. Supp.2d 597, 605 (E.D. Mich. 2004) (noting that Michigan state courts did not follow *Williamson* and did not need to do so under that state's evidentiary law).

taken by Dean McCormick[56] and informally taken by this Court in *Dewberry* and *Guidry*: Both statements that are directly against the declarant's interest and collateral "blame-sharing" statements may be admissible under Rule 803(24), if corroborating circumstances clearly indicate their trustworthiness.[57]  "Blame-shifting" statements that minimize the speaker's culpability are not, absent extraordinary circumstances, admissible under the rule.

Not only is this approach consistent with our case law, but we conclude that it also represents better evidentiary policy.  First, the attempt to sever collaterally neutral or "blame-sharing" statements from each specific self-inculpatory remark deprives the jury of important context surrounding that self-inculpatory remark.[58]  That approach places too much emphasis on the policy against admitting hearsay while undervaluing the need for meaningful evidence in criminal cases.  As noted by the Colorado Supreme Court, "the surgical precision called

---

[56] *See* note 31 *supra.*

[57] Even before the Texas Rules of Evidence were enacted, Professor Ray asserted that the common-law rule for statements against interest should permit the admission of "every fact" within the statement, "even though it includes collateral matters," although he (and Texas courts) would exclude purely self-serving statements.  *See* ROY R. RAY, TEXAS PRACTICE: TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL §§ 1007 & 1011 (1980 & Supp. 1991) (noting that, under the common law, Texas courts "do not admit really self-serving statements merely because they seem on their face disserving," but stating that a statement against interest "should be accepted as evidence of every fact it contains, even though it includes collateral matter"; in its post-Rules supplement, concluding that "the court should exercise its discretion to limit the admissibility of such statements not constituting declarations against interest (and not otherwise independently admissible) to those matters which ought in fairness be considered contemporaneously with it, or which are necessary to make the declaration against interest understood or to explain it.").

[58] *See People v. Newton*, 966 P.2d 563, 577-79 (Colo. 1998) (adopting Justice Kennedy's concurring position in *Williamson* based upon that state's prior case law and "better evidentiary policy").

for by [the plurality in] *Williamson* is highly artificial and nearly impossible to apply."[59]

Second, such an approach would, as Justice Kennedy noted, also apply to statements offered by the defendant to exculpate him.[60] This would unduly restrict defendants from offering exculpatory evidence and is not consistent with prior Texas cases that had assessed the trustworthiness of such statements by other means.[61] Third, and most important, the "testimonial" vs. "non-testimonial" approach to the Confrontation Clause taken in *Crawford* and *Davis* already provides a better mechanism to exclude uncross-examined statements that are most likely to be untrustworthy–those statements consciously made with an eye toward later criminal litigation.[62] We believe that our second-stage foundation requirement that no

---

[59] *Id.* at 578.

[60]  *See Williamson*, 512 U.S. at 617 (Kennedy, J., concurring) ("Thus, if the declarant said, 'I robbed the store alone,' only the portion of the statement in which the declarant said 'I robbed the store' could be introduced by a criminal defendant on trial for the robbery. That seems extraordinary." (citations omitted)); *see also LaGrand v. Stewart*, 133 F.3d 1253, 1267-68 (9th Cir. 1998) (state court did not err, under *Williamson*, in excluding co-defendant's confession that he stabbed victim and that defendant did not stab anyone, and was not present when stabbings occurred when offered by capital-murder defendant); *United States v. Porter,* 881 F.2d 878, 882-83 (10th Cir. 1989) (if a statement exculpatory to the accused is severable from the statement inculpatory to the declarant, each statement must be separately analyzed under Rule 804(b)(3)).

[61] *See Ramirez v. State*, 543 S.W.2d 631, 632-33 (Tex. Crim. App. 1976).

[62] *See United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (explaining that "Confrontation Clause jurisprudence was altered substantially" by *Crawford* and *Davis*, thus the concerns expressed in *Williamson* in favor of excluding all collateral statements when made to law enforcement officers no longer applies, and upholding the admission of blame-sharing statements to "trusted friends"); *United States v. Williams*, 506 F.3d 151, 156 (2nd Cir. 2007), *cert. denied*, 128 S.Ct. 1330 (2008).  As a practical matter, those testimonial "blame-shifting" or unreliable "blame-sharing" statements are most likely to be made by an accomplice when speaking to law-enforcement agents.  Even before *Crawford* and *Davis*, such statements were usually excluded under the hearsay exception for statements against penal interest. *See, e.g., Guidry v. State*, 9 S.W.3d 133 (Tex. Crim. App. 1999); *United States v. Sarmiento-Perez*, 633

statement against penal interest is admissible "unless corroborating circumstances clearly indicate the trustworthiness of the statement" is a sufficient guard against the use of unreliable "blame-sharing" statements.

Thus, the trial judge is obligated to parse a generally self-inculpatory narrative and weed out those specific factual statements that are self-exculpatory or shift blame to another. The gold of self-incriminating words cannot carry with it the dross of self-exculpatory ones.

## III.

In this case, the question is whether Markel's "street corner" spontaneous statements made to his brother on the day after the Outback robbery, pointing the finger at appellant as the sole shooter, were admissible simply because those statements were part of a larger narrative in which Markel also implicated himself. The State contends that the court of appeals correctly decided the issue because only by implicating appellant in the murders did Markel make himself criminally responsible.[63] Furthermore, the State argues, overwhelming independent corroborating evidence indicates the trustworthiness of the entire narrative.

---

F.2d 1092, 1102 (5th Cir. 1981) (discussing the reliability of a co-defendant's statement that inculpated the defendant, "There were . . . obvious motives for falsification[:] the very natural desire to curry favor from the arresting officers, the desire to alleviate culpability by implicating others, the enmity often generated in a conspiracy gone awry, the desire for revenge, all might lead an arrestee-declarant to misrepresent or to exaggerate the role of others in the criminal enterprise. . . . From these circumstances, which are not counterbalanced by circumstances indicating the reliability of the statement, it is reasonable to suppose that this declarant, and indeed a reasonable person in his position, might well have been motivated to misrepresent the role of others in the criminal enterprise, and might well have viewed the statement as a whole including the ostensibly disserving portions to be in his interest rather than against it.").

[63] State's Brief at 9.

First, the State notes that Markel's statements were not made to law enforcement agents and, thus, he did not have a motive to shift blame to appellant. According to the State, the fact that this was a "street corner" spontaneous conversation with the declarant's brother distinguishes this case from *Williamson*, in which the declarant gave testimonial custodial statements to the police. That is true. Statements to friends, loved ones, or family members normally do not raise the same trustworthiness concerns as those made to investigating officers because there the declarant has an obvious motive to minimize his own role in a crime and shift the blame to others.[64] But here a nervous Markel was seeking the help of his disapproving brother in an attempt to avoid detection for any part in a heinous capital murder. Markel clearly had at least some motive to minimize his level of culpability in his brother's eyes–the less culpable he was, the more likely that his brother would help him. As appellant asserts, Markel had reason to "curry favor" or shade the truth, even when speaking with a

---

[64] *Compare Williamson*, 512 U.S. at 607-08 (Ginsburg, J., concurring) ("A person arrested in incriminating circumstances has a strong incentive to shift blame or downplay his own role in comparison with that of others, in hopes of receiving a shorter sentence and leniency in exchange for cooperation. For this reason, hearsay accounts of a suspect's statements implicating another person have been held inadmissible under the Confrontation Clause."); *United States v. Sarmiento-Perez*, 633 F.2d at 1102 ("This was not a spontaneous declaration made to friends and confederates, but a custodial confession, given under potentially coercive circumstances that could not at trial and cannot now be adequately examined.") *with Cantu v. State*, 939 S.W.2d 627, 634 (Tex. Crim. App. 1996) ("It should also be noted that the statements were made in the presence of appellant's brother (a gang member himself) and his sister-in-law and thus the speakers reasonably felt they could confide in them and had no motivation to lie or place the blame for the crime on someone else."); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam) (statement against interest deemed reliable because, *inter alia*, it was made spontaneously to a close friend and the declarant had no ulterior motive to make the statement); *United States v. Costa*, 31 F.3d 1073, 1078-79 (11th Cir. 1994) (distinguishing custodial statements implicating self and others from "spontaneous declarations" made to acquaintances, friends and confederates, the latter being more trustworthy).

family member.  It must be kept in mind that the basis of this exception is not that a declarant is in a general "trustworthy" frame of mind. The probability of trustworthiness comes only from the facts asserted being self-inculpatory.

Second, the State urges that, under the law of parties, Markel's statements were inherently reliable because he talked himself into liability for the capital murders committed by appellant.  But it is far from certain that Markel–or the average reasonable person–would be aware that accompanying appellant to the Outback as part of the robbery plan would make him equally responsible for appellant's acts of killing the three employees.  We know that; the trial judge knew that; the prosecutor and defense counsel knew that.  But if this were so widely known to the average reasonable person, it would not be necessary to spend so much time during voir dire discussing the legal concept of party liability.  There is no evidence in this record that Markel, at the time he spoke to Roderick, knew that, by naming appellant as the Outback murderer, he was making himself criminally liable for those murders.  His "blame-shifting" statements bespeak more of ignorance than of trustworthiness.[65]

At any rate, when Markel explained how he was, at most, a lookout, while appellant went back to the office, took the money, gave it to Markel, and then went back into the office to shoot the three witnesses, that small role in the crime could tend to make him less culpable

---

[65] *See* note 26 *supra*.; *see also State v. Matusky*, 682 A.2d 694, 700 n.6 (Md. 1996) (stating that the party offering a statement against interest is "not required to prove the actual state of mind of the declarant but must prove sufficient surrounding facts from which the trial judge may inferentially determine what the state of mind of a reasonable person would have been under the same or similar circumstances") (internal quotations omitted).

in Roderick's eyes and thus make it more likely that his disapproving brother would aid him.

As appellant notes, out-of-court statements from a co-defendant that are against the declarant's penal interest but also inculpate the defendant are viewed with some suspicion.[66] That suspicion is lessened when the speaker makes no distinction between his conduct and that of the defendant–where there is absolute equality.[67] That is precisely why this Court upheld the admission of the co-defendant's statements in *Dewberry*–they were all "we" statements which inculpated the declarant and the defendant equally.[68] However, when the declarant minimizes his culpability and shifts major blame to a cohort, the self-serving aspect of the statement generally outweighs the self-inculpatory aspect. That is precisely why this Court found error in the admission of the declarant's blame-shifting statements in *Guidry*.[69]

The factual scenario here mirrors that in *Guidry*. In that case, as in the present one, the declarant co-defendant's statements were not equally against his and the defendant's interests.[70] Though some statements referred to their joint conduct, on the critical issue of who actually pulled the trigger, Prystash, the co-defendant, said Guidry alone was

---

[66] *See Williamson*, 512 U.S. at 600 ("The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability.").

[67] *See Dewberry*, 4 S.W.3d at 751.

[68] *Id.*

[69] *See Guidry*, 9 S.W.3d at 149.

[70] *Id.*

responsible.[71] Prystash essentially said that he was only the driver while Guidry did the dirty work. Likewise, Markel told Roderick how he waited in the hallway while appellant twice went into the Outback office alone, getting the money on the first trip and killing the three employees on the second. In *Guidry*, as in the present case, the statements were not made to law enforcement–Prystash was speaking to his girlfriend while Markel was speaking to his brother. The factual similarities lead to similar results. Here, as in *Guidry*, the portions of the co-defendant declarant's statements that shift blame to the defendant are not sufficiently against the co-defendant's interest to qualify for admission under Rule 803(24).[72]

Finally, the State argues that the reliability of all of Markel's statements are pedigreed by overwhelming corroborating circumstances. But corroborating circumstances relate to the second foundation prong,[73] not the first, which looks solely to the self-incriminating character of each statement.

We therefore conclude that the trial court abused its discretion in admitting Markel's narrative *in toto* without examining each fact asserted in the narrative to assess whether that fact was directly self-incriminating or, at a minimum, shared blame equally. The trial court erred in admitting those particular statements by Markel that shifted blame to appellant.

---

[71] *Id.*

[72] *See id.*

[73] Of course, independent corroboration of the inadmissible facts related by Markel may also be taken into account in any harm analysis.

Because the parties have not yet had an opportunity to brief the question of whether this error was harmful or not, we reverse and remand the case to the court of appeals to conduct such a review under Tex. R. App. P. 44.2(b).

Delivered: October 1, 2008

Publish