# NO. 12-14-00150-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DEEDRA MICHELLE GRUBBS,* *APPELLANT* | § | *APPEAL FROM THE 273RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *SHELBY COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Deedra Michelle Grubbs appeals her convictions for capital murder and two counts of aggravated assault. In two issues, Appellant argues that the trial court erred by failing to admit certain hearsay evidence under the statement against interest exception. We affirm.

## BACKGROUND

Appellant was charged by indictment with capital murder and two counts of aggravated assault. She pleaded "not guilty" to the offenses, and the matter proceeded to a jury trial.

At trial, the evidence showed that Appellant at one time earned money by cleaning homes. One day, she and her husband, Bobbie, went to one of the homes where she had previously worked. When the owner, Mary Jane Cashdollar, answered the door, Bobbie assaulted and attempted to kill her. Appellant took some guns and jewelry from the home, and the two left Cashdollar for dead.

Cashdollar soon regained consciousness and called the police. When Appellant and Bobbie learned that the police were looking for them, they left town. They began having vehicle problems and got a room at a motel. Bobbie shot three employees at the motel to obtain a vehicle, killing one of them. Bobbie and Appellant left in the stolen vehicle.

Ultimately, the jury found Appellant "guilty" of the capital murder of one of the motel employees and the aggravated assaults of the other two. The trial court assessed her punishment at imprisonment for life without parole, twenty years, and twenty years, respectively. This appeal followed.

**EXCLUSION OF EVIDENCE**

In Appellant's first issue, she argues that the trial court erred by failing to admit certain letters written by Bobbie under the statement against interest hearsay exception. In Appellant's second issue, she argues that the trial court erred by failing to admit Bobbie's in-car police video under the statement against interest hearsay exception.

**Standard of Review and Applicable Law**

Generally, we review a trial court's decision to admit evidence under an abuse of discretion standard. *See Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). We must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). We will not reverse a trial court's ruling admitting evidence unless that ruling falls outside the zone of reasonable disagreement. *See Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001).

Hearsay is generally not admissible. *See* TEX. R. EVID. 802. Once an opponent of hearsay objects, it becomes the burden of the proponent to establish that an exception makes the hearsay admissible. *Taylor v. State*, 268 S.W.3d 571, 578-79 (Tex. Crim. App. 2008). One such exception is for a statement that, at the time it was made, "so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in declarant's position would not have made the statement unless believing it to be true." TEX. R. EVID. 803(24). "In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* This exception stems from the notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true. *Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008).

2

## Excluded Statements

Appellant and Bobbie were apprehended by the police on the day of the shootings. In video from the police car that took Bobbie to jail, Bobbie confesses to the offenses and repeatedly declares Appellant's innocence. His statements in the video include the following:

[Appellant] was totally blameless . . . I made her go to the house with me. . . . I'm bad, she's not. I made her do everything. She didn't do nothing. She didn't pull no triggers. . . . I took her with me because she's a witness. . . . She's done nothing wrong. I made her—I had a gun on her when we went to that lady's house. She didn't want to. I made her. . . . I told her, "I'm taking you back. I'm shooting you or I'm taking you back. What do you want?" She goes, "I want you to shoot me. Bobbie, what you done, they're going to blame me." "Baby, you didn't do nothing. You got to be a mama to them girls." . . . I haven't been letting her take [her medicine]. She ain't the problem here. It's me. I made her go with me. I made her do everything. . . . [Appellant] is totally innocent, brother. I had her at gunpoint the whole time. . . . I made [Appellant] go up to the door. I made her. I had a pistol in the back of my pants. . . . I made her walk up there and I had her on gunpoint. I told her, "I'll shoot you if you don't do it." . . . But I tell you in all honesty though, [Appellant] didn't have anything to do with it. . . . She had nothing to do with this.

While Bobbie was in jail, he wrote a number of letters to Appellant and others. Some of the letters contain statements confessing his guilt and declaring Appellant's innocence. In one letter, Bobbie tells Appellant's friend that "[Appellant] is totally innocent. They have the bad guy, but they refuse to believe I was alone in this."

In a letter to Appellant, Bobbie made the following statements:

You are innocent of all this and I can prove it. Put me up on the stand and I'll tell em how I made you knock on the door under the threat of death, by the 357 in my pants. . . . All of your meds I hid from you were at the house. That's evidence you were off of them. I'm not scared to take responsibilities for my actions. You tell em what I did. . . . Your [sic] a victim too! Victim! Bobby [sic] is a crazy son of a bitch. He tryed [sic] to kill me too! He had a gun on me and held me prisoner . . . .

In a letter to Appellant's sister, Bobbie made the following statements:

I'll be the bad guy on this. All of it. So make sure [Appellant] doesn't try to protect me, she fears God and we are husband and wife, so don't let her take a bullet for me. [Appellant] is innocent. Make her lawyer understand she acted out of fear for her life. I'm the bad guy.

In another letter to Appellant, Bobbie made the following statements:

All the crimes are my mistakes. I'll fade all the heat due. I'll take full responsibilities for em all. It is the only thing I can do. I took you by gunpoint, I wasn't myself. I would of killed you too. . . .

3

I'll sign any affidavit they want. It's not fair you have to pay just by having my last name. Don't stay silent. Tell the Judge to call me for a bench warrant. Do not get railroaded. Don't take any deals. None! It will prove guilt. Stay away from deals. . . . All I can do is yell, stomp, write, I made you do this crime. Your mental capacity and being scared for your life is why you went to the Woodlands that day. . . . All I do know is I was really mean to you and I made you go with me.

In another letter to Appellant, Bobbie wrote, "On your case, don't take any deals that admits your guilty. Your not! If it goes to trial, Good! But remember my arrest. They were all going to trial, until they seen I was innocent, then it's like okay you can go. Remember? The same for you honey." In another letter, Bobbie told Appellant, "After I tell the truth, you'll be free. . . . I'm your husband. The person who done those awful things wasn't me. . . . Being charged and being convicted are two different things. You may be charged, but you'll never be convicted. Tell your lawyer he can come talk to me."

At trial, Appellant offered Bobbie's letters and in-car police video as evidence. The State objected, noting that the statements are hearsay. Appellant countered that she was offering the statements as statements against interest. She argued that the letters and video serve to corroborate each other. The trial court sustained the hearsay objections.

## Analysis

Rule 803(24) sets out two requirements for admissibility. *Walter*, 267 S.W.3d at 890. First, the trial court must determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability, and whether he realized this at the time. *Id.* at 890-91. Second, the trial court must determine whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement. *Id.* at 891.

The focus of the second inquiry is on verifying to the greatest extent possible the statement's trustworthiness so as to avoid the admission of a fabrication. *Davis v. State*, 872 S.W.2d 743, 748 (Tex. Crim. App. 1994). A variety of factors may be considered in evaluating corroborating circumstances, including whether the guilt of the declarant is inconsistent with the guilt of the defendant, whether the declarant was so situated that he might have committed the crime, the timing and spontaneity of the statement, the relationship between the declarant and the party to whom the statement was made, and the existence of independent corroborating facts. *Cunningham v. State*, 877 S.W.2d 310, 312 (Tex. Crim. App. 1994). The trial court may consider evidence that undermines the statement's reliability as well as evidence corroborating the statement. *Id.*

4

Appellant contends that Bobbie's statements in the letters and on the video are sufficiently against his penal interest and are also sufficiently corroborated to indicate their trustworthiness. She argues that the letters and video are corroborated by each other, by Bobbie's testimony, and by the recorded statement she gave the police shortly after her arrest. We agree that Bobbie's letters and the video contain statements against Bobbie's penal interest. We disagree that there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statements.

All of the evidence that Appellant relies on to corroborate the letters and video are statements made by her and Bobbie after their arrests. But the evidence of Appellant's actions tells a different story. Cashdollar testified that on April 25, 2012, she was getting ready to leave the house when she heard someone at the front door. She looked through the glass and saw Appellant waving her cell phone, tapping on the glass, and saying she needed to speak with her. Appellant told Cashdollar that she had lost all of her phone numbers and needed to get any that Cashdollar had.

Cashdollar said she opened the door and saw Bobbie against the wall holding his crotch with his knees crossed and "acting like a fool." Appellant told Cashdollar that Bobbie was her husband and needed to use the bathroom, then asked if he could come in. Cashdollar looked back at Appellant, and Bobbie immediately slammed her onto the stairs. Appellant came in and closed the door. Bobbie placed his arm around Cashdollar's throat and told Appellant to "get the guns." Appellant went and got the Cashdollars' handguns from their nightstands and the kitchen drawer. Then, with Appellant there watching, Bobbie tried to break Cashdollar's neck. Cashdollar testified that when Appellant was in her home, she seemed very happy, very pleased with herself, and completely unconcerned for Cashdollar. She said Appellant acted like she was in charge of her home.

The State introduced into evidence a police interview of Appellant recorded on the night of her arrest. Appellant states in that interview that after she and Bobbie left the Cashdollar residence, they went home. She turned on the police scanner and heard the name of the street where the Cashdollars lived. Bobbie left, and Appellant stayed home listening to the scanner. Soon she heard her telephone number being broadcast and called Bobbie.

Danielle Compte, a friend of Appellant, testified that Appellant called her that day around twelve o'clock. Appellant sounded upset and asked if Compte would come and pick her up at a

5

park. Compte agreed. In a later text message, Appellant said that she was in trouble and needed Compte to take her home with her. On the way to Compte's home, Appellant called Bobbie and told him that she was okay. Compte allowed Bobbie to come to her home as well, and the couple spent the night there. Compte said that Bobbie also seemed upset, but she did not see him argue with Appellant or threaten her in any way. They left early the next morning.

Michelle Joplin, a neighborhood acquaintance of Appellant, testified that Appellant text messaged her at around 12:30 on the day of the home invasion robbery and asked her to get the Grubbses' two daughters off the school bus. When Joplin got the first daughter off her school bus, the bus driver told Joplin that she was supposed to drop the child off with the police. Joplin took the child home with her and called Appellant. She told Appellant what the bus driver said and asked what she should do if the police came looking for the child. Appellant told Joplin to say she was not there.

Other evidence showed that on April 26, 2012, around 10:00 a.m., Appellant entered Regal Gold Buyers in Lufkin, Texas, and sold Cashdollar's stolen jewelry. Later that day, the couple started having car trouble and rented room 101 at the Joaquin Country Inn in Joaquin, Texas. Bobbie left Appellant alone in the room while he went and tried to find someone to repair the car. Bobbie testified that he tied Appellant up with the bed sheets in the room. But Appellant told the police that she was never restrained on the trip. Also, pictures taken in the room after the shooting show the sheets still on one bed and the other bed looking almost completely untouched.

Sam Watts, a survivor of the motel shootings, testified that on the morning of April 27, 2012, he saw Appellant and Bobbie sitting on the front porch of room 101. He said they watched him as he made his entire round of work duties. When Watts reached room 129, where Martha Acevedo-Chan and Marilyn Retamar were cleaning, he heard the sound of two people walking behind the building. He also noticed that Appellant and Bobbie were no longer on the porch. Watts ignored the sound and went in the room to change a light bulb. Bobbie soon came into the room with gun drawn and demanded keys. He then shot all three employees and left.

Retamar testified similarly to Watts regarding the events in the room. She also stated that when Bobbie first entered room 129, she saw Appellant through the open door. Retamar said Appellant was not near room 101 but was walking in an area near some picnic tables.

6

Appellant told the police that Bobbie said their plan after the shootings was to rob a bank and get their children. She said they got up that morning and got ready to go get the children, but they needed a car. She said Bobbie told her that he was going to get one. Appellant said she waited outside their cabin while Bobbie "went down a couple cabins." She said she thought he was just going to threaten the employees with the gun. She heard the gunshots, and Bobbie came back out and told her to help him find the keys. Appellant said they went into the motel office looking for the keys to Retamar's minivan. Appellant stated that they wanted the minivan because it was newer and had paper license plates. When they were unsuccessful in finding the minivan keys, the couple left in Watts's car.

In a letter Appellant wrote to Bobbie while in jail, she made the following statements:

My dad nor [my sister] Nancy hate you! They love you very much. Hey, they know me—okay. They've seen me through <u>ALL</u> my mistakes & addictions & choices. I'm just as guilty as you. Feeding the flesh & not knowing how 2 turn it off.
. . . .

Oh how sorry I am for not being a better friend, partner, wife. I failed you & our girls. If I hadn't of been so pushy & needy you never would have done what you did!!
. . . .

I still can't 4give myself. I've 4given you, but not me. I promised 2 love you through better or worse and in sickness or health. And we were 2 very sick individuals who didn't know how 2 get help.
. . . .

I gotta own my behavior. If I'm innocent then you R 2.
. . . .

So I got to walk past you again. ☺ And my knees got weak my heart pounding. I said DAMN I still love that crazy bastard. You complete me. You my mutha fucka ALWAYS!!
. . . .

I love you! I love you! I love you! XOXOXOXOXOXOXOXOXO
Love <u>always</u> & <u>forever</u>
Your wife
DeeDra Grubbs

All of this evidence tends to show that Appellant was not a victim of Bobbie but a willing participant in the crime spree with her husband. Only Bobbie's statements support the contention that Appellant is innocent of the offenses. And Bobbie had a motive to fabricate a story to exculpate Appellant. He knew that as the trigger man, he would most likely be

convicted. Thus, he had little to lose by taking all the blame himself in the hope that his wife could go home and raise their children.

Although Bobbie's statements after his arrest corroborate each other to the extent that they are consistent with one another, they do little if anything to indicate their trustworthiness as required under Rule 803(24). Considering all of the evidence in the record, including the evidence that undermines the statements' reliability as well as evidence corroborating the statements, we cannot say the trial court erred by ruling that the hearsay statements are not admissible under Rule 803(24). *See Cunningham*, 877 S.W.2d at 312. Accordingly, we overrule Appellant's first and second issues.

## DISPOSITION

Having overruled Appellant's first and second issues, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered December 30, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

DECEMBER 30, 2015

NO. 12-14-00150-CR

**DEEDRA MICHELLE GRUBBS,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 273rd District Court
of Shelby County, Texas (Tr.Ct.No. 14CR19075)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*