

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-76,521

---

### BRIAN EDWARD DAVIS, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. 616522
### IN THE 230TH DISTRICT COURT
### HARRIS COUNTY

---

**KEASLER, J., delivered the unanimous opinion of the Court.**

### O P I N I O N

Davis was convicted of capital murder committed in 1991.[1]  Pursuant to the jury's

answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071,

the judge sentenced Davis to death.  This Court affirmed the original conviction and

sentence.[2]  In 2009, this Court granted relief on its own motion on a claim raised in Davis's

---

[1]  TEX. PENAL CODE § 19.03(a).

[2]  *Davis v. State*, 961 S.W.2d 156 (Tex. Crim. App. 1998).

previous writ of habeas corpus and remanded the case for a new punishment hearing because the nullification instruction given to the original jury was not a sufficient vehicle to allow jurors to consider and give full effect to Davis's mitigating evidence.[3]  Upon retrial, based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.0711, §§ 3(b)(1), 3(b)(2), and 3(e), the judge sentenced Davis to death.[4]  Direct appeal to this Court is automatic.[5]  Davis raises six points of error.  Finding his contentions to be without merit, we affirm Davis's conviction and sentence of death.

In his first point of error, Davis claims that the judge abused her discretion by not allowing the defense to call Monesa Mendoza Downs to testify regarding an extraneous offense involving the 1988 murder of Keith Blaylock.  Davis had been linked to that murder through Thomas David Cason's testimony and DNA found on a stocking mask allegedly used in the crime.  Davis wished to offer Downs's testimony regarding statements made by her then-boyfriend, Tyler Strader, to rebut those links.

In 1988, Keith Blaylock worked at the Beverage Barn in Mineral Wells, Texas.  In June 1988, he was abducted during a robbery of the Beverage Barn.  His body was found about ten miles away the next day.  Blaylock had been shot in the back of the neck with a .22-caliber firearm.  During the investigation, Davis became a person of interest because he

---

[3]  *Ex parte Davis*, No. AP-76,263 (Tex. Crim. App. Nov. 18, 2009) (not designated for publication).

[4]  TEX. CODE CRIM. PROC. art. 37.0711, § 3(g).

[5]  *Id.* art. 37.0711, § 3(j).

had been heard talking with other individuals about robbing the Beverage Barn before it happened. During police questioning, Davis admitted that he only talked "hypothetically" about robbing the Beverage Barn and stated that he had no serious intent to do it. Davis was released, and no charges were filed at that time.

Police also investigated Tyler Strader in connection with Blaylock's death. Downs gave investigators a sworn statement in which she claimed that, on the morning after the murder, Strader told her that he had been out drinking with a few friends the night before. He mentioned the names of the three people he had been drinking with, but Downs could only remember the names Ben Davis and "Blaylock" (who presumably was someone other than the victim). Strader said that the men became very intoxicated and began talking about killing someone. Believing that his friends were getting too drunk, Strader decided to leave and was taken home by his friends. Later that same day, Strader told Downs, "Wow, they did it. Those crazy sons of bitches, they did it, they killed that boy." Strader also said, "They took him out on a dirt road and shot him in the head." Strader allegedly made these statements several hours before Blaylock's body was discovered. Strader never told Downs that he was with "them" when they kidnapped and murdered Blaylock. He never stated that he was involved in Blaylock's abduction and murder.

During trial, Davis attempted to offer Downs's sworn affidavit and testimony, which admittedly contained hearsay, as a statement against Strader's penal interest. In a hearing conducted outside the jury's presence, Downs testified in regards to her affidavit. Davis

argued that because Strader knew specific details of the murder, he therefore incurred criminal liability by making the inculpatory statements. The State objected, arguing that the testimony did not meet the statement-against-penal-interest hearsay exception because there was not enough corroboration for the statements to be considered trustworthy. Davis countered that the testimony was corroborated because of the specificity of the information. The State's objection was sustained, and Davis made a bill of exception.

On appeal, Davis argues that the judge erred in denying Downs's proffered testimony as it should have been admissible as a "declaration against penal interest" under Texas Rule of Evidence 803(24). The exception for statements against penal interest "stems from the commonsense notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true."[6] In order for a declaration against interest to be admissible under Rule 803(24), the statement must be self-inculpatory with corroborating circumstances.[7] "[O]nly those statements that are directly against the speaker's penal interests (including 'blame-sharing' statements) are admissible under Rule 803(24). Self-exculpatory statements that shift blame to another must be excluded."[8]

Strader's statements are not self-inculpatory. Downs's proffered testimony was that Strader said "those crazy sons of bitches did it," and " [t]hey took him out on a dirt road and

---

[6] *Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008).

[7] *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999).

[8] *Walter*, 267 S.W.3d at 886.

shot him in the head." Strader's word choice shows that he did not consider himself part of the group who committed the crime. As his statements do not show that he had a role in the crime, they are not statements against his penal interest.[9] Even if Strader's statements could be interpreted as somewhat inculpatory, they more closely resemble blame-shifting statements, which are not sufficient under the Rule 803(24).[10] Therefore, the statements are unreliable hearsay, and the judge properly excluded them as failing to meet the Rule 803(24) hearsay exception. Point of error one is overruled.

In his second point of error, Davis argues that the judge abused her discretion by denying his motion for mistrial after Thomas Cason, Davis's accomplice in the Beverage Barn robbery, informed the jury that Davis had previously been sentenced to death. Davis asserts that the judge's instruction to disregard the statement was insufficient to cure the prejudice it caused.

In its direct examination, the State asked Cason why he told his cousin the details of the robbery several years later. His response included an unsolicited statement that Davis had been on death row:

> [STATE]: Between the time that the crime occurred, you go to prison, you get out. Did you find out whether or not Brian Davis had been convicted of another crime?
>
> [CASON]: Yes, ma'am.

---

[9] *See Guidry v. State,* 9 S.W.3d 133, 149 (Tex. Crim. App. 1999).

[10] *Walter*, 267 S.W.3d at 896.

[STATE]:     So, why did you tell him?

[CASON]:    Brian was on death row and he had already done something else
            and I had told him—

Defense counsel immediately asked to approach the bench. Outside the presence of the jury, Davis objected that Cason deliberately made the comment, it was prejudicial, and it denied him a fair punishment hearing and due process of law. Cason admitted that he was instructed not to use the words "death row" during his testimony, but that it was a "slip." The judge sustained the objection. Davis then argued that because he was not permitted to question jurors about their feelings regarding his previous death sentence, he had been unable to challenge prospective jurors for cause on that basis, and therefore he had a strong case for a mistrial. The State opposed a mistrial, explaining that the jurors had shown a willingness to follow all of the judge's instructions and stating that it believed they would disregard the statement when instructed to do so. Further, the State noted that the jurors were aware of Davis's capital murder conviction and had likely already concluded that he received a death sentence from the first jury, but that an instruction would cure any potential harm. Defense counsel agreed that the State had not elicited the answer and expressly disclaimed any prosecutorial misconduct, but continued to argue for a mistrial. The judge continued the motion-for-mistrial hearing until the next morning. However, she sustained the objection before the jury and instructed the jury to disregard Cason's statement before recessing court for the night.

The following morning, the State presented two cases, *Guidry v. State*[11] and an unpublished opinion from this Court, *Garcia v. State*,[12] in which either the prosecutor or a witness had commented about a previous death sentence of the defendant or co-defendant, but this Court found the comments cured by an instruction to disregard.[13] Davis again argued that he was harmed because he had not been allowed to question jurors about whether knowledge that he had previously received a death sentence for the instant crime would affect their ability to serve as jurors. The judge denied the motion for mistrial. Cason's testimony continued with neither the State nor the defense mentioning Davis's previous death sentence in his earlier trial.

A denial of a motion for mistrial is reviewed under an abuse of discretion standard, and a judge's ruling must be upheld if it was within the zone of reasonable disagreement.[14] It is well settled that improper remarks can be rendered harmless by a judge's instruction to disregard, unless it appears they were so clearly calculated to inflame the minds of the jury

---

[11] 9 S.W.3d 133 (Tex. Crim. App. 1999).

[12] No. AP-71,417, 2003 WL 22669744 (Tex. Crim. App. Nov. 12, 2003) (not designated for publication).

[13] *See Guidry*, 9 S.W.3d at 154 (holding State's comment about co-defendant receiving death sentence cured with instruction to disregard); *Garcia*, 2003 WL 22669744 at *3-4 (holding instruction to disregard rendered harmless witness's comment that he saw defendant being transported with death row inmates because "[t]he uninvited and unembellished reference to death row . . . was not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard.").

[14] *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010).

or were of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind.[15]  Here, Cason's uninvited and unembellished reference to Davis's being on death row was not so inflammatory as to undermine the efficacy of the judge's instruction to disregard.[16]  We presume the jury follows the judge's instructions, and there is no evidence to the contrary in this case.[17]  The judge did not err in denying the motion for mistrial.  Point of error two is overruled.

In his third, fourth, and fifth points of error, Davis contends that the judge abused her discretion in prohibiting him from asking potential jurors what effect, if any, that knowledge of his previous death sentence would have on their answers to the special issues. Specifically, he wanted to inquire how this knowledge would affect their verdict, if they would set that knowledge aside when answering the special issues and if they would promise that the information would not affect their verdict.   He argues that the judge's decision to limit questions on this subject violated his constitutional rights under the Sixth Amendment to the United States Constitution and Article I, § 10, of the Texas Constitution.

After nine days of individual voir dire and the selection of eleven members of the jury, the Houston Chronicle ran a feature story discussing capital murder cases that had been reversed for new punishment hearings and the possibility that, under the law at the time of

---

[15]  *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992);  *Stoker v. State*, 788 S.W.2d 1, 13 (Tex. Crim. App. 1989).

[16]  *See Kemp*, 846 S.W.2d at 308.

[17]  *See Colburn v. State,* 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

their convictions, these defendants may already be eligible for parole if given life sentences on re-trial. The article specifically mentioned Davis's case as one of the cases from 1991 that was reversed and noted that jury selection had commenced. Before voir dire resumed the day the article was published, Davis moved for a mistrial due to the possibility that some of the eleven jurors already selected or the remaining prospective jurors might have read the article or heard about it from someone else. Davis also argued that he had not been given permission to talk to the jurors about his previous death sentence. Therefore, he believed that he should be allowed, "at a minimum," to reexamine the jurors already selected.

The judge denied the motion for mistrial, noting that the motion presumed that the members of the venire were actually aware of the newspaper article and its contents. She would allow the remaining venire members to be asked specifically whether they had read anything about the instant case. Additionally, she would permit the eleven jurors already selected to be questioned regarding whether they had read anything about it. Davis again requested permission to ask the jurors how they would react if they found out that he had received a death sentence from the previous jury. The judge asked him how the jury would know that information unless the defense chose to present it. The judge refused to allow counsel to ask that question in the remaining voir dire and held that, as the case currently stood, evidence of the prior jury's punishment verdict was inadmissible unless the defense chose to offer it; in that event, the defense was to approach the bench before presenting any such evidence. Defense counsel noted that Davis might testify regarding his two execution

dates. He then requested confirmation that he would not be permitted to specifically ask the jurors: "If you were to find out that this defendant received the death penalty and was on death row from the previous trial, would it affect your verdict in this case?" The judge responded:

> That's correct. Because, one, I don't think you put it in their mind and then ask them about it. And, two, it is no different than some of the other questions that have been objected to. If you are telling me that the defense intends to offer that evidence and then you're going to ask the jury how they're going to respond to it, that's a commitment question. And so, if you are talking about asking them how they would respond to a specific type of evidence that might come into – to the trial that you might introduce and then ask them how they're going to respond to it, that's akin to many of the questions that you've objected to as a commitment question.

The judge reconfirmed her denial of the motion for mistrial.

After the remainder of the jury and alternates were selected, the judge brought back the first eleven jurors so she could question them regarding whether they knew of the newspaper article. Prior to questioning, Davis again requested permission to ask what he conceded was a "commitment question" regarding how the jurors would react if they learned he had received the death penalty from the previous jury. Specifically, he wanted to know if the jurors could set aside that information in answering the special issues. Davis stated that he planned to introduce evidence regarding his prior time on death row, that he believed the evidence was mitigating, and that he should be allowed to challenge for cause any juror who would find the evidence aggravating. The judge again held that this was an improper commitment question and that Davis was not entitled to ask jurors whether they would find

specific evidence to be aggravating or mitigating. Davis then requested permission to ask the question "hypothetically":

> In a hypothetical capital murder case, if you learn that the defendant was on death row and had been sentenced to death by a jury, if you learn that in a hypothetical case, would you promise us that that would not affect your verdict in this case in any form of [sic] fashion? And if they tell us that would affect us, we think they should be disqualified for cause. If they say that won't effect [sic] them, then they are good to go.

The judge denied Davis's request, but agreed to instruct the jurors that they were not bound by any decisions made by a prior jury and that those prior decisions were not to affect how they answered the special issues.

When the judge questioned each of the initially seated eleven jurors regarding whether they had read the Houston Chronicle article, she also inquired as to whether the decisions of a prior jury would affect their answers to the special issues. All of the jurors confirmed that they were aware that they were not bound by any decisions of a prior jury in the context of answering the special issues and would base their answers solely on the evidence presented.

A defendant has a constitutional right to a trial "by an impartial jury."[18] However, this right is not without limitations, and the judge has broad discretion over the process of selecting a jury.[19] We leave to the trial judge's discretion the propriety of a particular

---

[18] U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed"); TEX. CONST. art. I, § 10 ("In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury").

[19] *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002) (citing *Allridge v. State*, 762 S.W.2d 146, 167 (Tex. Crim. App. 1988)).

question, and her decision will not be disturbed absent an abuse of discretion.[20]

A judge's purpose for prohibiting improper commitment questions by either the State or the defendant is to ensure that the jury will listen to the evidence with an open mind–a mind that is impartial and without bias or prejudice–and render a verdict based upon that evidence. Commitment questions require a venireperson to promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all of the evidence in its proper context. It is this prejudgment of the value and importance of certain evidence that is to be avoided unless the law requires such a commitment.[21]

As we set out in *Standefer v. State*,[22] the inquiry for improper commitment questions is: (a) is the question a commitment question, and (b) does the question include facts–and only those facts–that lead to a valid challenge for cause?[23] Davis concedes the answer to the first part of the inquiry by admitting at trial and on appeal that his requested questions are indeed commitment questions. Therefore, we now determine whether the questions include only those facts that lead to a valid challenge for cause.

The three questions proffered by Davis each required the jurors to refrain from

---

[20]  *Id.*

[21]  *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005).

[22]  59 S.W.3d 177 (Tex. Crim. App. 2001).

[23]  *Id.* at 182.

resolving issues in the case based upon a specific fact not contained in the indictment. Each question posited by Davis included the fact that the former jury sentenced him to death, information that was not applicable to the jury's consideration of the special issues. Davis additionally argues that the questions were "proper" because they would lead to useful information to use for exercising peremptory strikes. However, that is not the test to determine whether a question is a permissible commitment question.

Here, the new jury was not necessarily going to be informed of the outcome of Davis's original punishment trial. This information would be revealed only if Davis chose to introduce evidence of his own behavior while on death row to explain his reactions to the setting of an execution date. Davis wanted the jury to consider this evidence to be mitigating, and he wished to challenge anyone who might consider it to be aggravating. However, if Davis decided to introduce such evidence, it would be improper to instruct the jury how they must consider it or ask how they would consider it. Davis could not use voir dire to determine how the jury might view his trial strategy. The selected jurors and remaining prospective jurors were properly asked whether the decisions of the previous jury would influence them, without being informed of the former death sentence. The judge did not abuse her discretion in refusing to allow the requested commitment questions. Points of error three through five are overruled.

In his sixth point of error, Davis posits that the judge improperly prohibited him from presenting mitigating evidence because she would not allow him to ask the three requested

commitment questions set out in points of error three through five above. Davis argues that "[b]efore using such mitigating evidence, [he] needed assurance that the jury would not use improperly the fact that another jury had answered the Special Issues in a way that put [him] on death row."

The voir dire record shows that the judge specifically told Davis that she was not prohibiting such evidence, but that if he wished to present evidence of his previous death sentence during trial, he was required to first approach the bench to discuss compliance with the evidentiary rules. Davis never attempted to present the complained-of evidence during trial. Nor did he preserve error by making an offer of proof setting forth the substance of the evidence to be proffered.[24] The mere possibility that the judge's ruling placed Davis at a strategic disadvantage does not entitle him relief.[25] Because the judge did not err, point of error six is overruled.

We affirm the trial court's judgment.


DELIVERED: October 23, 2013

DO NOT PUBLISH

---

[24] TEX. R. EVID. 103(a)(2).

[25] *Ripkowski v. State*, 61 S.W.3d 378, 389-90 (Tex. Crim. App. 2001) ("[F]acing a dilemma is not enough to create an actionable claim.").