**AFFIRM; and Opinion Filed May 18, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01490-CR

**ANTHONY WAYNE MANGIAFICO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1228019-M**

## MEMORANDUM OPINION
Before Justices Lang, Stoddart, and Schenck
Opinion by Justice Schenck

Appellant Anthony Wayne Mangiafico was indicted for the offense of capital murder. A jury found him guilty as charged, and he was sentenced to life imprisonment. In two issues, appellant challenges the sufficiency of the evidence to support his conviction and the admission of hearsay statements by an accomplice. We affirm the trial court's judgment. Because all issues are settled in law, we issue this memorandum opinion. TEX. RS. APP. P. 47.2(a), 47.4.

### BACKGROUND

On or about February 17, 2012, William Allen Easterling was murdered in his home in Garland, Texas. Easterling suffered multiple stab wounds as well as possible blunt-force wounds. His throat was cut and his body was partially burned. Easterling's car and possessions had also been stolen. Appellant was charged with the murder. Because appellant challenges the sufficiency of the evidence to support his conviction, we review the facts in some detail.

Witnesses Dixie Haynes and Jonathan Scott testified about appellant's actions the day of the murder. Appellant called Haynes and asked her for a ride. Appellant accompanied Haynes to Lewisville; Haynes then drove appellant to a service station in Garland at approximately 9:45 in the evening. Appellant told Haynes he did not have any money to reimburse her for gas. At the service station, appellant walked over to a white jeep driven by Mark Speers and returned with five dollars for Haynes. Haynes left appellant at the service station. After midnight, appellant called Haynes and asked her to meet him at a Wal-Mart. Haynes agreed. When they met, appellant was driving a newer model cream-colored Nissan, later proven to be Easterling's car. Appellant was no longer wearing a shirt, and his knuckles and knee were injured. Appellant gave Haynes several $100 bills and asked her to purchase some shoes, T-shirts, and toiletries for him, which she did at a nearby Walgreen's.

Haynes called Scott to inquire whether appellant could spend the night at Scott's home. Scott testified that Haynes referred to appellant as "T-bone," or "Tony." When Scott agreed, both Haynes and appellant drove to Scott's home. Scott testified that he, Haynes, appellant and others went to Scott's garage to use methamphetamine. Both Haynes and Scott testified that appellant appeared to have been in a fight. Appellant had marks on his knuckles and his face, was limping, and appeared to have a blood stain on his shorts. Appellant gave different explanations to Haynes and Scott about his appearance. Appellant took a shower and washed his clothes at Scott's home. Scott testified that appellant showed him a rifle and other items such as tools that were in the Nissan appellant was driving. Scott also saw the title to the car in a file box in the trunk. Appellant and Scott discussed whether Scott could sell the tools.

Mark Speers and Christi Delorme also came to Scott's home the night of the murder. Speers had Easterling's credit cards in his possession. Speers gave the cards to appellant, who gave them to Haynes to "run," or use. Speers also had "an excessive amount" of

methamphetamine, which he "doled out" to Haynes and others. Haynes testified that she used the credit cards the following morning, and received a call from appellant, who was "so happy," "so excited, you would have thought it was Christmas," and "just hyped up about how the cards are working." Other evidence offered at trial showed that Easterling's credit cards had been used at a Foot Locker store within a day of the murder. A surveillance video from the Foot Locker store showed appellant in the store at the time. A store manager who was working that day testified that he observed red markings or scratches on appellant's face, as well as other "suspicious activity" by appellant including pacing back and forth in the store.

Haynes later saw appellant at a "game room," where drug users often use slot machines while they are high. Appellant told Haynes that the "old man" had put up a "good fight." Later, appellant came to Haynes's home to get Easterling's credit cards that Haynes had used. Appellant went to another room in Haynes's home and shredded the credit cards. Haynes overheard appellant confess to her roommate that he had taken a man's life; that only the inside of the house had burned; and that the man had put up a good fight.

Also on the night of the murder, the Garland Fire Department received a call regarding the smell of smoke near Easterling's home. No fire was found in the neighborhood, however. An arson investigator testified at trial that a fire had been started in Easterling's home but was mostly confined to the living area where Easterling's charred body was later found. Rags had been stuffed up the chimney of the home which prevented smoke from escaping up the flue. But the rags also had the effect of depriving the fire of oxygen, and as the investigator testified, "when you have a fire in a very, very tight compartment, when it runs out of oxygen, it is going to snuff itself out." The investigator testified the fire probably started approximately an hour before the fire department received the call at 1:52 a.m.

James Bridges testified that he and appellant met in the Scotts' garage and "started hanging out" when they were both using methamphetamines. Bridges had a car and sometimes gave appellant rides. Bridges also occasionally allowed appellant to stay overnight in his home. Bridges testified that after the murder, "[appellant] did ask me, he said, James, if I were to pour gas in a house and set it on fire, why wouldn't it burn?" Bridges thought it was "an unusual question," but because of his methamphetamine use "was just worried about the next fix."

On February 19, appellant sold Easterling's car to Khanh Nguyen. Nguyen testified at trial, identifying appellant as the seller. He explained that although he received the title from appellant, he later learned from police that the car had been stolen.

Melinda Frazier, a friend of Speers and Delorme, testified that she accompanied Speers to two Wal-Mart stores to use Easterling's credit cards. She also testified that before Easterling's death, Speers and Delorme talked about killing him. Over the next few days, Frazier became frightened by Speers's statements about Easterling. In addition, Frazier met appellant who warned her that she did not want to end up like "the old man." She testified that Speers planned to "discover" the body and wanted to use her as an alibi. She left Speers's company, however, and called police to check on Easterling. Easterling's body was discovered by police on February 22, 2012.

Easterling's sister Joan Beasley testified that Easterling was 63 years old at the time of his death and had many health problems including diabetes and high blood pressure. He was also an alcoholic and "had trouble with the shakes and all of that." Beasley testified that Speers was Easterling's live-in caregiver. Speers cooked for Easterling, helped with medicines, drove him to doctor's appointments, and similar tasks. After about a year of caring for Easterling, Speers invited Delorme, his girlfriend, to live in Easterling's home as well. Beasley testified she saw her brother for the last time on February 10, 2012. On that date, Easterling had in his

possession $8,000 in cash from an inheritance that he planned to take to the bank to deposit. The money, however, was never deposited.

Beasley described the relationship between her brother and Speers as "off and on." She testified that Easterling had "kicked [Speers] out on a number of occasions," but "then would turn around and Mark would beg to get back in, so he would let him come back, cause he felt sorry for him." On February 10, Beasley had a conversation with Speers about moving out, because Easterling had given Speers "a 30-day notice to move" several weeks earlier, and Beasley saw no evidence that Speers and Delorme intended to comply. Instead, she observed that items such as tools were missing or being moved from Easterling's home.

Easterling told Beasley he thought Speers was stealing from him. Beasley testified that Speers had Easterling's ATM password. She explained that Speers was "taking care of" Easterling's bills, writing checks for Easterling to sign. But the bills Beasley saw were for Speers's own expenses, not Easterling's.

After Easterling's death, Beasley received records of Easterling's financial affairs. There were thousands of dollars charged on different credit cards in Easterling's name. Beasley testified she knew her brother had not obtained the credit cards by himself because "he didn't believe in credit cards." She assumed that Speers and Delorme had opened the credit card accounts using Easterling's financial information. Beasley also confirmed that Easterling's car was stolen at the time of his murder but was later recovered and returned to her.

Chris Tannock, a City of Garland police officer, responded to the welfare call for Easterling's address. He saw evidence of a fire when entering the residence, and discovered Easterling's body on the floor. There was no indication of a forced entry to the home. Tom Olvera, a detective with the City of Garland Police Department, participated in the murder investigation. He was assigned to the forensic team and gathered evidence. He discovered in the

course of his investigation that Easterling had several credit cards that were used after his death. Olvera testified that he viewed videos from the Foot Locker store, a Dick's Sporting Goods store, and a gas station where Easterling's credit cards had been used. The same group of people appeared in the Foot Locker and Dick's Sporting Goods videos, using Easterling's credit cards; Frazier appeared in the gas station video and photos.

The State also introduced cell phone records into evidence at trial. A custodian of records for Metro PCS testified regarding calls and text messages sent between two cell phones in Garland the night of the murder. The cell phone records showed entries identifying the user as "T-bone." Texts on the night of the murder included messages to appellant's phone to "hurry," "before he goes to sleep," and inquiring if appellant was "out of there."

Stacey Tooke, a detective in the crimes against persons unit of the City of Garland Police Department, was assigned to the case as a forensic investigator. He testified that there was soot and ash "everywhere" at the crime scene. There was a knife and a pistol in the kitchen sink. There were drops of blood between Easterling's body and the sink. He discussed a video of the crime scene that was shown to the jury. He also discussed the phone records obtained in the investigation. He traced two specific phone numbers to a person by the name of "T-bone." Tooke's investigation led to Haynes, who described the places she had been with appellant on the night of the murder. Haynes accompanied Tooke to the gas station where she had dropped off appellant. The gas station was less than a mile from Easterling's home.

Gary Sweet was the lead homicide detective investigating Easterling's murder. He obtained information from Haynes which led to identifying and arresting appellant. When appellant was arrested, approximately ten days after the murder, Sweet observed bruises and wounds on appellant's face, hands, and body that were healing. Appellant was also limping.

Nathaniel Patterson, a forensic pathologist, prepared an autopsy report. He testified that Easterling died from two wounds to the jugular veins in his neck. Easterling had a total of seventeen wounds, including incised, blunt-force, and stab wounds. Robert Williams, a forensic odontologist, identified Easterling's body from dental records.

Haynes, Scott, Frazier, and Bridges all admitted to using methamphetamine in the time period of the murder. Frazier was a prostitute, and was on probation at the time of trial for offenses including possession of a controlled substance. Haynes and Frazier were not prosecuted for their admitted use of Easterling's credit cards. Scott was not prosecuted for possession of some of Easterling's property after the murder. At the time of trial, Haynes was in federal custody, serving a sentence for mail fraud. She was also on probation for tampering with a government record, having false identification, and theft. The jury heard the evidence regarding the criminal history of these witnesses. Neither Speers nor Delorme was called to testify. The jury was instructed that Speers was an accomplice to the offense, and that appellant could not be convicted on Speers's testimony alone unless there was other evidence tending to connect appellant to the offense. Speers was the only person named as an accomplice in the jury charge.

### STANDARDS OF REVIEW

We review a challenge to the sufficiency of the evidence of a criminal offense for which the State has the burden of proof under the single sufficiency standard set forth in *Jackson v. Virginia,* 443 U.S. 307 (1979). *Matlock v. State,* 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Under this standard, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id.* We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

–7–

We review a trial court's rulings on hearsay objections for an abuse of discretion. *Saavedra v. State*, 297 S.W.3d 342, 349 (Tex. Crim. App. 2009). A trial court abuses its discretion when a decision is so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). A trial court's ruling on the admissibility of evidence will be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

Appellant also challenges the trial court's ruling on his objection that the admission of certain evidence violated his right to confront the witnesses against him. We review constitutional legal rulings de novo. *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006).

### DISCUSSION

#### A. Admission of evidence

In his second issue, appellant complains that the trial court erred by overruling his objections to the admission of hearsay evidence at trial. He also contends the admission of the evidence violated his constitutional right to confront the witnesses against him. We address this issue first before determining whether there was sufficient evidence to support the jury's verdict.

The State moved to introduce hearsay testimony by Frazier about statements made by Speers that implicated appellant in committing the murder. When appellant objected, the trial court held a *sub rosa* hearing on the admissibility of the statements. The trial court overruled appellant's objection, and Frazier testified before the jury as follows:

Q Ms. Frazier, my last question was, I believe, did Mark Speers tell you what happened to Mr. Easterling?

A Yes.

Q And what did he tell you?

A He told me that he had his throat cut from ear to ear and he was stabbed 19 times and shot and then set on fire.

Q Did—well, let's go back, did he say what was his involvement in what happened to Mr. Easterling?

A He staged the robbery.

Q Did he give the name of the person that did those things to Mr. Easterling?

A Not at that time.

Q Did he eventually tell you?

A Yes.

Q Who was involved?

A Yes.

Q And what name did he give?

A Tony.

Q Did you know Tony?

A No.

Appellant contends this evidence is inadmissible hearsay. The State argues that the evidence is admissible under rule 803(24) of the Texas Rules of Evidence as a statement against interest. Rule 803(24)[1] provides that statements against interest are not excluded by the hearsay rule:

[1] The Texas Rules of Evidence were amended effective April 1, 2015. Tex. Sup. Ct. Order, Misc. Docket No. 15-9048 § 2 (Mar. 10, 2015) (published at 78 TEX. B.J. 42 (2015)). The rules were "restyled" in order to "make the rules more easily understood and to make style and

**(24) Statement Against Interest.** A statement that:

**(A)** a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability or to make the declarant an object of hatred, ridicule, or disgrace; and

**(B)** is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

For a statement against interest to be admissible under rule 803(24), the statement must be self-inculpatory with corroborating circumstances to indicate the trustworthiness of the statement. *Woods v. State*, 152 S.W.3d 105, 112 (Tex. Crim. App. 2004). In evaluating admission of a statement against interest, the trial court must first determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability, and whether the declarant realized this when he made the statement. *Walter v. State*, 267 S.W.3d 883, 890–91 (Tex. Crim. App. 2008). Statements that are against the declarant's own interest, as well as collateral "blame-sharing" statements that implicate both the declarant and the defendant, may be admissible. *See id.* at 894–95. As appellant argues, however, statements that minimize the declarant's culpability and merely shift blame to the defendant are not self-inculpatory for purposes of the rule. *See id.* at 893–96.

Next, the court must determine whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement. *Id.* at 890–91. Where the statement is offered by the State to inculpate the defendant, the following factors are relevant to the inquiry: (1) the timing of the declaration; (2) the spontaneity of the declaration; (3) the relationship

terminology consistent throughout." *Id.* The changes to most of the rules, including the changes to rule 803(24), were "stylistic only." *Id.* The amended rule is quoted here.

between the declarant and the party to whom the statement was made; and (4) the existence of independent corroborative facts. *Woods*, 152 S.W.3d at 113.

Appellant contends that Speers's statement only shifted the blame to appellant, citing *Walter* and *Guidry v. State*, 9 S.W.3d 133 (Tex. Crim. App. 1999). We disagree. In *Guidry*, the declarant shifted the blame entirely to the appellant, identifying the appellant as the triggerman and describing himself only as the driver. *See id.* at 149. In *Walter*, the declarant stated that he waited in the hallway while the appellant committed the robbery and murders. *Walter*, 267 S.W.3d at 899. Here, in contrast, Frazier testified that when Speers made the statement to her, he was explaining that "his friend Tony, Tony came through for him is what he said." Frazier explained that Speers "had it all planned out" and "had a certain way that he wanted everything to go down." Speers planned to have Frazier present to "discover" Easterling's body, but the plan was postponed because Speers did not want the discovery to occur while appellant was still in possession of Easterling's car. The State points out that Speers's postponement of his plans indicates his knowledge that his statements plainly subjected him to criminal liability. There is no evidence that appellant had any connection to Easterling other than through Speers; the only evidence is that appellant participated in Speers's plans to rob and murder Speers's employer.

There are also corroborating circumstances. *See id.* at 890–91. Under the four factors described in *Woods*, the declaration was made shortly after the offense was committed but before law enforcement was aware of Easterling's murder. Speers and Frazier were in the motel room where Frazier was living, and Speers was explaining to Frazier the next steps in the plan. He was not attempting to minimize his own role, but instead explained how appellant "came through for him." Speers had frequently discussed robbing and killing Easterling in Frazier's presence in the months leading up to the murder. His statements were not made in an attempt to deflect

–11–

blame from himself, and were not made at a time or under circumstances in which he would benefit by minimizing his own role in the robbery and murder.

Regarding the relationship between Speers and Frazier, Frazier testified that they were friends. Speers saw Frazier and Delorme on a daily basis in the eight months leading up to the murder. Speers provided rides to and from school for Frazier's son, helped Frazier move, paid her rent on one occasion, and helped her post ads for her services. Statements to friends do not raise the same trustworthiness concerns as statements to law enforcement officials, where the declarant has a motive to minimize his own role in a crime. *See Walter*, 267 S.W.3d at 898.

Regarding the existence of corroborating facts, appellant confessed to Haynes's roommate that he had killed a man. Appellant stated to Haynes that the "old man" had put up a "good fight." He warned Frazier that she did not want to "end up like the old man." He asked Bridges why a house would not burn if he poured gas in it and set it on fire. Immediately before the murder, appellant had no car and had to borrow five dollars for gas money for Haynes. The same night, immediately after the murder, appellant was driving a new car and gave Haynes several hundred dollar bills to buy him new clothes. These and other facts tend to corroborate Speers's statement.

Appellant next argues that the trial court's admission of Speers's statements violated his right to confront the witnesses against him. The question presented is whether Speers's statements were "testimonial in nature." *See Crawford v. Washington*, 541 U.S. 36, 68–69 (2004) (Confrontation Clause applies to "testimonial statements"); *Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010) (out-of-court statements offered against accused that are testimonial in nature are inadmissible unless declarant presently unavailable to testify and accused had prior opportunity to cross-examine). Whether a particular statement is testimonial in nature is a question of law. *Id.*

We conclude Speers's statements to Haynes were not testimonial. In *Crawford*, the Court did not define "testimonial," but explained that statements derived from police interrogations, ex parte testimony at a preliminary hearing, testimony before a grand jury, or testimony at a former trial are testimonial in nature. *See Gongora v. State*, 214 S.W.3d 58, 62 (Tex. App.—Fort Worth 2006, pet. ref'd) (citing *Crawford*, 541 U.S. at 68). Here, Speers's statements were made to Frazier, his friend, in her hotel room. The statements were made before police were aware of Easterling's death. Casual remarks spontaneously made to acquaintances are not testimonial in nature. *See Woods v. State*, 152 S.W.3d 105, 113–14, 114 n.34 (Tex. Crim. App. 2004) ("street corner" statements made to appellant's friends were not testimonial in nature) (quoting *Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.")). We overrule the portion of appellant's second issue regarding the Confrontation Clause.

Having concluded that the trial court did not err in overruling appellant's objections to the admission of Speer's statements to Haynes, we turn to appellant's issue challenging the sufficiency of the evidence to support his conviction.

## B. Sufficiency of the evidence

Appellant contends the evidence was insufficient to support his conviction. He argues (1) there is no evidence showing he was present at Easterling's home the night of the murder; (2) there is no evidence that he was the perpetrator or a party to the murder; and (3) the evidence was insufficient to prove he was committing or attempting to commit a robbery as alleged in the indictment.

Appellant was indicted for the offense of capital murder. Section 19.03(a) of the penal code defines capital murder in relevant part as the intentional murder of an individual in the

course of a robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2014). A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he "intentionally, knowingly, or recklessly causes bodily injury to another" or "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02(a)(1), (2).

Appellant makes several arguments regarding lack of evidence at trial. He points out that there is no eyewitness testimony about the murder or robbery. He argues that no witness placed appellant at Easterling's home at the time of the murder. There was no forensic evidence connecting appellant to the murder, although police took DNA samples of appellant to compare to evidence found at the crime scene. Appellant made no statement to the police implicating himself in the crime. None of the witnesses testified to smelling smoke residue on appellant. Although witnesses thought they saw blood on appellant's clothes, there was no further evidence or testing to confirm whether the substance was blood and if so, whether it was Easterling's. There was no evidence of any blood in Easterling's car even though appellant was driving it immediately after the time of the murder. None of Easterling's property was in appellant's possession when appellant was arrested. There was no testimony linking the scratches on appellant's face and hands to the murder, such as DNA evidence found under Easterling's fingernails or at the crime scene. The Metro PCS records custodian who testified at trial admitted that records did not show who was using the phones in question at any given time. Almost all of the evidence came from methamphetamine users who participated in using Easterling's stolen credit cards. Almost all of these witnesses had criminal records, but none were charged with any criminal activity relating to Easterling's murder. Finally, appellant argues that the evidence points to Speers and Delorme as the sole perpetrators of the crime.

Appellant also contends there is insufficient evidence to establish robbery. He argues that there was no evidence that the car was taken from Easterling's home at the time of the murder, or any evidence of how appellant obtained it. Appellant makes a similar argument regarding his possession of Easterling's tools. Appellant contends an equally likely assumption is that Speers was already using Easterling's car and other property before the murder. Finally, appellant contends there was no evidence of his specific intent to exercise control over Easterling's property either before or during the commission of the murder.

Appellant also asserts that the State's evidence "almost exclusively came from alleged friends or acquaintances of the Appellant who testified that he made incriminating statements to them or that they overheard the statements being made to some other person." He urges that the State's witnesses Frazier, Haynes, and Scott were actually co-conspirators or accomplices for whom the State must provide corroboration. *See* TEX. CODE CRIM. PROC. ANN. § 38.14 (West 2006) (conviction cannot be had upon testimony of accomplice unless corroborated by other evidence tending to connect defendant with offense committed; corroboration not sufficient if it merely shows commission of offense). In support of that contention appellant notes that Frazier admitted using Easterling's stolen credit cards, and was to be Speers's "alibi" when "discovering" the body. Haynes likewise testified that she used Easterling's stolen credit cards more than once. And, Scott admitted he kept some of the tools for sale, although he thought they were stolen.[2] Appellant maintains we must not consider the accomplice evidence in our determination whether there is evidence to connect him to the offense, citing *Castillo v. State*, 221 S.W.3d 689 (Tex. Crim. App. 2007).

---

[2] Appellant also urges that these witnesses are not credible because of their methamphetamine use, their criminal records, and the fact that they were "rewarded" for their testimony by lack of prosecution relating to the theft of Easterling's property. The jury, however, was made aware of these facts when the witnesses testified, and was the sole judge of credibility. *See Winfrey*, 393 S.W.3d at 768.

–15–

A person is an "accomplice" if he participates before, during, or after the commission of the crime. *Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999). The evidence must raise the issue of the witness's accomplice status. *Id.* "Mere presence during the commission of the crime does not make one an accomplice, nor is one an accomplice for 'knowing about a crime and failing to disclose it, or even concealing it.'" *Id.* (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)). Appellant does not argue that the jury should have been instructed that anyone other than Speers was an accomplice, or explain how any evidence of participation by Frazier, Haynes, or Scott would have supported a charge against them. *See id.* (defendant is entitled to accomplice-witness instruction only if "there is sufficient evidence in the record to support a charge against the witness alleged to be accomplice") (quoting *Smith v. State*, 721 S.W.2d 844, 851 (Tex. Crim. App. 1986)).

Even if we assume that Frazier, Haynes, and Scott were somehow "accomplices" in a relevant sense, evidence corroborating their testimony need not be sufficient by itself to establish guilt; there simply needs to be "other" evidence "tending to connect" the defendant to the offense alleged in the indictment. *Id.* at 691. Even "apparently insignificant incriminating circumstances" may provide sufficient corroboration. *Trevino v. State,* 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). We look at the particular facts and circumstances of each case and consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense. *Smith v. State,* 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). No precise rule dictates the amount the evidence required to corroborate the testimony of an accomplice. *Gill v. State,* 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). In addition, we review corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008).

Here, the jury heard non-accomplice testimony that (1) appellant sold Easterling's car, complete with title, to Nguyen; (2) cell phone records contained incriminating messages at the time of the murder sent to a number connected to "T-bone," appellant's nickname; (3) appellant had healing cuts and bruises at the time of his arrest that were consistent with an attack on Easterling; (4) appellant inquired of Bridges why, if he poured gas in a house set it on fire, it would not burn; and (4) appellant participated in using Easterling's credit cards at a Foot Locker store after the murder. Thus, the testimony of Haynes, Frazier, and Scott that appellant (1) confessed to the crime to Haynes's roommate; (2) was flush with cash after the murder, and had no money immediately prior; (3) was driving Easterling's car immediately after the murder, filled with Easterling's tools; (4) had blood on his clothes and appeared to have been in a fight; (5) shredded Easterling's credit cards after Haynes used them; (6) threatened Frazier that she did not want to end up like the "old man"; and (7) told Haynes that the "old man" put up a "good fight"; was sufficiently corroborated by other independent evidence tending to connect appellant with the crime. *See Brown*, 270 S.W.3d at 568–69. And as we have discussed, the jury properly considered Speers's statement that appellant murdered Easterling. We conclude the evidence was sufficient to support the jury's verdict. We overrule appellant's first issue.

## CONCLUSION

Having overruled appellant's two issues, we affirm the trial court's judgment.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

131490F.U05

–17–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANTHONY WAYNE MANGIAFICO,
Appellant

No. 05-13-01490-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1228019-M.
Opinion delivered by Justice Schenck,
Justices Lang and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of May, 2015.