

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PAUL EDWARD JOHNSON, | § | No. 08-17-00156-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 41st District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20150D05061) |
| | § | |

## <u>MEMORANDUM OPINION</u>

A jury found Appellant, Paul Edward Johnson, guilty of the felony offenses of murder[1] and aggravated assault,[2] and it assessed his punishment at confinement for forty years and confinement for ten years, respectively. It also recommended that his ten-year sentence for aggravated assault be suspended and he be placed on community supervision. The trial court sentenced Appellant to confinement for forty years for murder and, in accord with the jury's recommendation, suspended his ten-year sentence for aggravated assault and placed him on community supervision for ten years, with the sentences to run concurrently. In two issues, Appellant contends that the trial court erred in not compelling a witness to testify and excluding the testimony of another witness during

---

[1]      *See* TEX.PENAL CODE ANN. § 19.02(b), (c).

[2]      *See id.* § 22.02(a).

the guilt-phase of trial.

We affirm.

## Background

Indica Anderson testified that at 1:29 a.m. on August 5, 2015, she and her roommate, Ashley Harris, went to the "Player's Club," a bar located in Northeast El Paso. Upon their arrival, they spoke with Cortez Thomas, wearing a navy-blue hat and black shirt and whom Anderson knew only as "Flex," before entering the bar.

Upon entering the bar, Anderson and Harris saw two male friends. The first was the complainant in the murder case, Toris Knight, also known as "Five-Five," and the second was a man that Anderson knew only as "Ruga." After Knight and Ruga bought the women some drinks, Anderson, Harris, and Ruga walked out the back door of the bar on to a balcony, where "a good number of people" were drinking, talking, laughing, and smiling. "And there wasn't any bad vibes."

Later, from the balcony, Anderson saw Knight, who had previously left the bar, drive up in a car with another person and park "in the back" of the bar. After he exited the car, Knight went to a "smoking" patio where he spoke with "some of the people that was over there already."

Anderson further testified that shortly thereafter, there was "a lot of commotion going on, so I know there's going to be a fight . . . ." She, while still on the balcony, saw Knight and Rashad Chisholm, the complainant in the aggravated assault case, "moving backwards" while some other men walked toward them. At that point, a "bunch of different guys" fought with Knight, "throwing blows," "some were trying to get ahold to him and some couldn't. So it was like, basically, they were all trying to jump on him, but they couldn't hold him." And they "were doing the same thing" to Chisholm.

2

After the fight "moved out to the road," "further in the road," Anderson heard five to six gun shots that sounded the same. She saw, "lined up from where [she] was standing on the balcony," a man wearing a "red-and-black-and-gray striped shirt" with a small "shiny silver" gun "lifted" up and "aimed" in the "direction" of Knight. Although "other people [were] standing around," the man had "really a straight shot" at Knight, who "was moving back away from the fight," "standing off by himself when shots were fired." Chisholm was also "in the road," but "not standing beside" Knight.

Harris, noting that Knight "was hit," "jumped over the balcony." So Anderson went "down to see, also." She "started walking towards the road when [she] came out from the balcony." When Anderson got to Knight, "he was crawling" and Harris "was crawling behind him by the time he fell on the ground." He then turned over while the two women tried "to see where the bullet holes were." Because law enforcement officers had not arrived "fast enough," Anderson told Harris to "go get [her] car" from in front of the bar. As soon as Harris left, Knight "took his last breath."

Subsequently, Harris and Anderson drove to a police station and gave statements to a detective. Anderson described the man she saw shoot Knight as a "tall, skinny" man in his twenties, with a "box haircut," and wearing a red and black striped shirt. What stood out most to Anderson about the man she saw shoot Knight was his shirt. And Anderson later identified Appellant as the man she saw shoot Knight in a photographic line-up and in still-frame images from the Player's Club security camera videotapes.

Shannon Walker testified that at about 11:00 p.m. on August 4, 2015, he went to the Player's Club with his friends D'Andre Wilford and Eddies Sims. At some point, they visited and shot pool with their friends, Appellant, Cortez Thomas, Dianco Murray, and two men Walker knew

3

as "G" and "Gutta." Later, while Walker had his "back turned towards the back . . . entrance," around the bathroom area, someone punched him "in the back of the head."

Although Walker did not see who had punched him, Wilford told him that it was Chisholm who had punched him. Walker "stumbled" outside and told his friends, "I've just been hit." And he "planned" to fight Chisholm; however, Murray ended up fighting with Chisholm and G ended up fighting with Knight. After about two minutes, the four men "basically just stopped fighting" because there were "just so many people out there" and Thomas "had come up with a gun, Flex."

Thomas had apparently retrieved G's gun, a "MAK 90," which looked like "a small machine gun," "[f]rom the car." Walker saw Thomas point the gun and shoot one round at Chisholm, who "took off running." Knight backed up and ran away "backwards." The gun "jammed," and Thomas tried to remove the clip. Walker told Thomas to "chill out" and "calm down," but "it didn't take effect."

Walker further testified that he then saw Appellant, whom Walker had known for approximately three weeks as a cousin of Gutta, point a "small," "shiny" silver gun at Knight and shoot "three times." At this point, Walker "took off," he jumped into a car with a girl named Jenny, and they went to the apartment of D'Andre Langley, where Walker was staying. Later, Walker heard "a commotion," "a couple cars that pulled up with . . . the people [he] was with at Player's."

Walker, Appellant, Thomas, Wilford, G, Gutta, Eddie Sims, and "a girl named Purp" then proceeded to Thomas's apartment in the same building. Once inside, Walker asked Appellant and Gutta "[w]hat happened" at the bar. Gutta replied, "My lil cousin. He got his stripes. He – he did it. You know, he killed him." And Appellant, who was standing "right next to" Walker and Gutta, acted "nonchalant." Walker subsequently asked, "Who did it?" and Appellant replied, "I did it."

4

Later, in the kitchen, G told Walker, "My little cousin left that N word stanking." That is, he "left him dead." After about ten minutes, Walker left the apartment.

D'Andre Wilford testified that just after 12:00 a.m. on August 5, 2015, his friend, Eddie Sims, drove him to the Player's Club to "pick up" some money from Walker. While standing at the back door of the bar, Wilford saw a fight start outside "in the back of Player's in the parking lot." He walked outside where he saw "about four people" involved in the fight, and then he saw Thomas with a MAK gun in his hand. Wilford then heard a gunshot and saw Walker and Thomas "fighting over the gun." He then heard "four or five" more "shots go off."

Wilford further testified that he saw the man who shot the second round of shots. He explained that he had given the man a cigarette earlier before the fight broke out. And he identified Appellant in court as the man he saw shoot the second round of shots. After the shots, Wilford saw Knight fall as he was running away.

Dr. Mario Rascon, the Chief Medical Examiner of El Paso County, testified that he performed an autopsy on the body of Knight. Upon examination of Knight's body, Rascon found evidence of blunt force injuries and two gunshot wounds, one through the left upper arm, and one to the chest. And based on his examination of the body, Rascon opined that the cause of Knight's death was the gunshot wound of the chest.

Appellant testified that between 12:00 and 1:00 a.m. on August 5, 2015, he went to the Player's Club with Ashley Jones, an acquaintance, and her cousin, "Jessica." He introduced Jessica to his friend, Gary Jackson, also known as "Gutta," with whom he had grown up, and they all sat down at the bar, close to the front door, "and had drinks." Later, Appellant heard a "commotion" and saw a large "group of people" enter the bar, a man hit another man from behind, and the group then rush out the back door. Gutta then told Appellant that he was going outside to

5

record the fight on his cellular telephone, but Appellant stayed inside the bar.

Feeling "woozy" and "very intoxicated," Appellant went into the restroom and "started throwing up." And the bartender who had served him drinks then came into the restroom and said, "It's getting wild out there." The bartender had come to "check on" Appellant, noting that he had "been in [the restroom] for a long time. What's going on?" Appellant replied that he was "throwing up from not eating."

Later, as he was about to leave the restroom, Appellant heard gunshots. He then went to look for the women he "was with," but the bartender told him that they had "walked out." Appellant then walked out the front door and approached Jones, who was in her SUV. However, she would not let him in the SUV because she was angry that he had spoken with another woman earlier. A law enforcement officer then detained him, and, between 5:30 to 6:00 a.m., when the sun was rising, he was allowed to leave. Jones then picked him up, and they went to her apartment to sleep.

**Standard of Review**

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Tarley v. State*, 420 S.W.3d 204, 206 (Tex. App.–Houston [1st Dist.] 2013, pet. ref'd). A trial court abuses its discretion if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Tarley*, 420 S.W.3d at 206. A trial court does not abuse its discretion if some evidence supports its decision. *See Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002); *Tarley*, 420 S.W.3d at 206. We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to the case. *See De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Tarley*, 420 S.W.3d at 206.

## Compelling Testimony

In his first issue, Appellant argues that the trial court erred in excluding the testimony of Rashad Akeem Chisholm, "the complaining witness in Count II of the indictment," "after he asserted his privilege against self-incrimination" because it "should have considered more than just the related nature of the instant case and the case the witness was a defendant in."

In response, the State asserts that Appellant failed to preserve his complaint for review. Alternatively, it asserts that despite Appellant's assertions on appeal that Chisholm had no reason to fear incriminating himself, it is undisputed that Chisholm had rejected the State's offer of immunity. The State further argues that because Chisholm stood "accused of having committed an aggravated assault in retaliation for the shooting of which he was a complaining witness," "any admission of having been present during the shooting would have created evidence for the State to use against him in his pending case." Thus, Appellant has "failed to show that the trial court's inquiry was any less than was possible . . . ." And the State asserts that "given the overwhelming evidence of [Appellant's] guilt, any error in excluding Rashad's testimony was harmless.

The United States Constitution expressly provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. This privilege extends not only "to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant." *Walters v. State*, 359 S.W.3d 212, 215 (Tex. Crim. App. 2011)(quoting *Ohio v. Reiner*, 532 U.S. 17, 21, 121 S.Ct.1252, 149 L.Ed.2d 158 (2001). "It need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious

7

disclosure could result." *Walters*, 359 S.W.3d at 215 (quoting *Hoffman v. United States*, 341 U.S. 479, 486-87, 71 S.Ct. 814, 95 L.Ed.2d 1118 (1951).

Thus, the Texas Court of Criminal Appeals has long "held that an individual's constitutional privilege against self-incrimination overrides a defendant's constitutional right to compulsory process of witnesses." *Bridge v. State*, 726 S.W.2d 558, 567 (Tex. Crim. App. 1986); *Ellis v. State*, 683 S.W.2d 379, 383 (Tex. Crim App. 1984); *Grayson v. State*, 684 S.W.2d 691, 696 n.2 (Tex. Crim. App. 1984); *Glasper v. State*, 486 S.W.2d 350 (Tex. Crim. App. 1972). Moreover, a defendant has no right to call a witness merely to have him "assert or invoke his Fifth Amendment privilege against self-incrimination in the presence of the jury." *Ellis*, 683 S.W.2d at 382; *Mendoza v. State*, 552 S.W.2d 444 (Tex. Crim. App. 1977); *Victoria v. State*, 522 S.W.2d 919 (Tex. Crim. App. 1975); *Rodriquez v. State*, 513 S.W.2d 594, 596 (Tex. Crim. App. 1974).

However, trial courts "are not to simply take the word of potential witnesses who claim to fear prosecution." *Walters*, 359 S.W.3d at 215. Indeed, the United States Supreme Court has held that a danger of "imaginary and unsubstantial character" will not suffice. *Reiner*, 532 U.S. at 21, 121 S.Ct. at 1254. Instead, trial courts are required to inquire into the source and reasonableness of that fear. *Walters*, 359 S.W.3d at 215. And a trial judge, in appraising the claim, "must be governed by his personal perceptions of the peculiarities of the case as by the facts actually in evidence." *Id*. (quoting *Hoffman*, 341 U.S. at 486-87, 71 S.Ct. at 814). As noted by the court of criminal appeals, "[t]hough innocence is no impediment to asserting the Fifth Amendment privilege, the privilege's protection extends only to witnesses who have 'reasonable cause to apprehend danger from a direct answer.'" *Walters*, 359 S.W.3d at 215, (quoting *Hoffman*, 341 U.S. at 486, 71 S.Ct. at 818).

Relying on *Walters*, Appellant specifically argues that the trial court failed to make the

required inquiry into the reasonableness of Chisholm's assertion of the Fifth Amendment privilege against self-incrimination because it erroneously "base[d] its decision on only one factor."

Here, the trial court, outside the presence of the jury, explained its decision not to compel Chisholm's testimony as follows:

> Okay. Well, we did have Mr. Chis[h]olm and his counsel yesterday on the record outside the presence of the Jury. They asserted their Fifth Amendment right and an explanation on circumstances upon which Mr. Chis[h]olm finds himself with other pending -- another pending case. He then asserted his Fifth Amendment before the Jury, and that was the extent of his testimony.
>
> The Court was made aware that Mr. Chis[h]olm's pending case -- pending, I believe, in the 120th District Court -- is an engaging in organized criminal activity by aggravated assault. That – and that the facts of that particular case stemmed from this incident, where it is alleged that he participated in a retaliatory aggravated assault against another person under circumstances where this incident that we're trying here today, this case that occurred at Player's, is the foundational situation for the alleged retaliation. That is the extent of my understanding.
>
> And, because the two cases are potentially so factually intertwined, to include the fact that Mr. Rashad Chis[h]olm may have been at Player's, may have been shot at, and it's alleged by the State that he was, pursuant to Count II of this indictment here, against [Appellant]; because the United States Supreme Court authority on the Fifth Amendment describes that the privilege against self-incrimination extends itself to a person's testimony that could create evidence that would link him to the prosecution of another case. And that his own testimony could provide the State with incriminating evidence against him.
>
> I just feel the two cases are so intertwined that it would be, certainly, a risk to Mr. Chis[h]olm, at worst. And so, on that basis alone, I will respect his -- his assertion of the privilege.

.        .        .

So he will not, under any circumstances, testify. . . . My ruling.

Appellant emphasizes that prior to the trial court making its ruling, he asked the State whether it had "offered a limited sort of immunity, saying that they would agree not to use anything that [Chisholm] said in connection with testimony in this case against him in any sort of criminal prosecution, if the State would confirm that?" The State confirmed, "Judge, I know we had

9

discussed offering him use immunity, that anything that he said here in this trial, would not be used against him in his other pending case. I know that was discussed. And [Chisholm's attorney] outright rejected that as well."

Appellant, without citation to any authority, further argues that the trial court "should have taken into account the fact that [Chisholm] had been offered immunity" because his fear of prosecution or that his testimony "would be used against him in that related matter would [have been] eliminated." He complains:

> Where the District Court erred is in failing to inquire into and consider all the relevant factors before making its ruling. As the Judge stated she made the ruling based solely on the intertwined nature of the two cases involving the witness. This results in an abuse of discretion and reversible error.

As noted above, the State first argues that Appellant failed to preserve his complaint for review because he "failed to object to the trial court's ruling accepting [Chisholm's] assertion of his Fifth Amendment rights against self-incrimination, let alone assert, as he does now on appeal, that the State's offer of immunity (even though it was rejected by [Chisholm]) rendered [Chisholm's] assertion of his rights unreasonable . . . ."

To preserve error for appeal, a party must make a timely, specific objection or request in the trial court and obtain a ruling on the objection. TEX. R. APP. P. 33.1(a); *Garza v. State*, 126 S.W.3d 79, 81–82 (Tex. Crim. App. 2004). The rationale of Rule 33.1 is that if objections are raised before the trial court as soon as error becomes foreseeable, they may be addressed and the error possibly corrected or avoided. *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009). Notably, the record must show that the complaining party gave the trial court an opportunity to rule on the complaint by presenting that complaint to the trial court in a specific and timely objection. TEX. R. APP. P. 33.1(a); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Lankston v. State*, 827 S.W.2d 907,

10

909 (Tex. Crim. App. 1992).

Simply put, it is not enough to tell the trial court that certain evidence is admissible; the proponent of the evidence must tell the trial court why the evidence is admissible. *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005). Further, it is well settled that the legal basis of a complaint raised on appeal may not vary from the complaint raised at trial. *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *Smith v. State*, 236 S.W.3d 282, 291 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd). It is imperative to avoid forfeiting a complaint on appeal that a party "let the trial [court] know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the [trial court] to understand him at a time when the [court] is in the proper position to do something about it." [Internal quotations omitted]. *Pena*, 285 S.W.3d at 464. A reviewing court will not consider errors, even those of constitutional magnitude, that were not called to the trial court's attention. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Rothstein v. State*, 267 S.W.3d 366, 373 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd).

Appellant on appeal now complains that the trial court, in excluding Chisholm's testimony, erroneously based its ruling "solely on the intertwined nature of the two cases involving" him and "fail[ed] to inquire into and consider all the relevant factors." However, a review of the record reveals that Appellant did not present this complaint to the trial court. *See* TEX. R. APP. P. 33.1(a); *Garza*, 126 S.W.3d at 81–82; *Reyna*, 168 S.W.3d at 177; *Pena* 285 S.W.3d at 464.

Regardless, even assuming, without deciding, that Appellant properly preserved his first issue for our review, his argument that the trial court "should have taken into account the fact that [Chisholm] had been offered immunity," necessarily fails, as noted by the State. The fact remains, as noted above, that Chisholm, through his attorney, had rejected the State's offer of use immunity. Thus, contrary to Appellant's assertion, Chisholm's "fear of prosecution or that his testimony

11

would be used against him in th[e] related matter" would not have been "eliminated." The bottom line is that "[t]he trial court cannot compel a witness to answer unless it is perfectly clear . . . that the witness is mistaken in asserting the privilege, and that the answer cannot possibly tend to incriminate [him]." *Grayson*, 684 S.W.2d at 696-97.

Here, as in *Walters*, the trial court did, in fact, make the requisite inquiry in compliance with United States Supreme Court precedent. *See Walters*, 359 S.W.3d at 216. It even held a hearing outside the presence of the jury at which Appellant proffered his questions and stated Chisholm's expected testimony. *See id.* The previous day, Chisholm's attorney, in the presence of Appellant's counsel and the State, had explained to the trial court that Chisholm would exercise his Fifth Amendment privilege because he feared that his testimony would be used against him in a pending, factually-intertwined retaliation case. And he rejected the State's offer of use immunity. As in *Walters*, this was "as much of an inquiry as was possible while protecting [Chisholm's] right against self-incrimination and the privileged nature of [his] conversation with [his] attorney." *See id.*

We conclude that the trial court's inquiry into the reasonableness of Chisholm's invocation of his Fifth Amendment privilege was sufficient to establish the risk of incrimination. *See id.* at 216-17. Accordingly, we hold that the trial court did not err in not compelling Chisholm to testify.

We overrule Appellant's first issue.

### Exclusion of Testimony

In his second issue, Appellant argues that the trial court erred in excluding the testimony of Carlos Nieves that Cortez Thomas, also known as "Flex," "told him that he [had] shot someone and was accompanied by a man nicknamed 'Little Boosie' rather than Appellant" because his information was "critical to the defense and to the theory of a different individual being involved."

12

He asserts that the trial court "merely found this matter time consuming and ruled it hearsay without further inquiry."

The State argues that because Appellant, at trial, "forewent any attempt to show that the complained-of excluded hearsay statement was trustworthy," he "cannot now demonstrate on appeal that the trial court abused its discretion in excluding the statement as hearsay, where it is well settled that, as a condition precedent to a statement's admissibility as a statement against a person's penal interest, the proponent of the statement must present sufficient corroborating circumstances that *clearly* indicate its trustworthiness." [Emphasis in orig.]. Alternatively, the State argues that because Appellant "was not precluded from presenting his mistaken-identity defense" and the evidence of his guilt, including his "demonstrably implausible and inconsistent self-serving testimony," is "overwhelming," any error in excluding Nieves's testimony about what Thomas had told him was harmless.

Appellant called as his first witness Nieves, who testified in front of the jury that sometime in 2015 or 2016, while he was an inmate in the El Paso County Detention Center, he decided to contact the El Paso Police Department about information he had about "another case" not related to the instant case. However, the "wrong detective . . . showed up" to meet Nieves at the El Paso County Jail Annex, and he and another officer asked Nieves about "Cortez," also known as "Flex," and his involvement in another case not connected with the instant case.

Ultimately, Nieves did give to the officers "information about the commission of some offense of murder." He explained, "I just told them what Flex told me." After Appellant's trial counsel asked Nieves about "what information" he had given to the officers "in connection with this case," the trial court sustained the State's hearsay objection. Nieves then noted that "Cortez," or "Flex," with whom he "ended up in the same pod," "was the source of [his] information" and

13

he did not know his last name. When Appellant's trial counsel asked Nieves whether "Cortez" had ever given him "any information," the State objected to hearsay, and the trial court excused the jury.

Outside the presence of the jury, the following exchange occurred:

[Trial Counsel]:     You have just spoken a while ago, sir, about, you received some information from some individual. And I think you said that guy's name, or nickname, was Flex?

[Nieves]:     Yes.

[Trial Counsel]:     And you knew him to be Cortez Thomas?

[Nieves]:     Yes, sir.

[Trial Counsel]:     Okay.

[Nieves]:     Cortez, I mean.

[Trial Counsel]:     Okay. Cortez? And did he make any statement to you about criminal activity –

[Nieves]:     He told me what he did and what happened.

[Trial Counsel]:     Okay. And what did he tell you that he had done that was criminal activity in connection with this case?

[Nieves]:     The shooting of that –

[Trial Counsel]:     Okay. Specifically, what did he say to you?

[Nieves]:     Well, that –

[Trial Counsel]:     I'm sorry?

[Nieves]:     They had did some shooting.

[Trial Counsel]:     Did he tell you that he shot somebody?

[Nieves]:     Yeah, him and some other dude.

[Trial Counsel]:     Okay. Did he tell you who it was?

14

[Nieves]: That got shot?

[Trial Counsel]: Yeah.

[Nieves]: No.

[Trial Counsel]: Okay. Just that he shot somebody. And did he tell you whether or not there was another person involved in that shooting on his side of the conflict?

[Nieves]: One other person.

[Trial Counsel]: Okay. And who -- did he give you a name or a nickname of that other person?

[Nieves]: A nickname.

[Trial Counsel]: I'm sorry?

[Nieves]: A nickname.

[Trial Counsel]: Okay. And what was the nickname that he gave you?

[Nieves]: Little Boosie.

[Trial Counsel]: Boosie? Do you know who that is or was?

[Nieves]: No, sir.

[Trial Counsel]: Okay. Did you communicate this information to the police officers?

[Nieves]: Yes, sir.

[Trial Counsel]: Okay. And after that do you have anything further to do with this matter other than what we're talking about here, where somebody had confessed to you that he was involved in a shooting and that he had some help and the guy's name was Boosie?

[Nieves]: That was it.

Nieves further explained, "I mean, [Cortez] went into more detail about it, but I'm just telling you what I can remember. I haven't slept in three days. It was a long trip. And they get us up at 2:00 in the morning and drive us down here, so I'm a little – I'm sorry."

15

After Appellant's trial counsel passed the witness, the State did not ask Nieves any questions, simply re-urged its hearsay objection to Nieves's testimony, and noted that "[i]t does not have any corroborating circumstances of trustworthiness that would allow it to be admissible under 803.24." During the discussion of the issues with Appellant's trial counsel and the State, the trial court stated, "I'm also having a little bit of problem with the reliability. I don't know enough about the statement or the discussion with law enforcement." After further questioning Nieves and extensive discussions with Appellant's trial counsel and the State, the trial court sustained the State's hearsay objection and, back in the presence of the jury, excused Nieves from testifying further.

Generally, the rule against hearsay excludes from evidence any out-of-court statement offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d), 802. A statement, if offered in a criminal case, is admissible into evidence if: (1) "a reasonable person in the declarant's position would have made" it "only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to . . . criminal liability" and (2) it "*is supported by corroborating circumstances that clearly indicate its trustworthiness*." [Emphasis added]. TEX.R.EVID. 803(24)(A)(B).

The exception for statements against penal interest "stems from the commonsense notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true." *Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008). Simply put, "a reasonable person would not normally claim that he committed a crime, unless it were true." *Id*. And "[t]his is the guiding principle behind both the Texas and federal hearsay exceptions for statements against penal interest." *Id*.

Here, in assessing the admissibility of Thomas's statement to Nieves, the first inquiry is

"whether the statement, considering all the circumstances," subjected Thomas to criminal liability and whether he "realized this when he made th[e] statement" to Nieves. *Id*. at 890-91. The second inquiry is "whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness" of the statement. *Id*. at 891. If Thomas's statement to Nieves properly satisfied both inquiries, it was admissible as a statement against penal interest. *Id*.

As explained by the Texas Court of Criminal Appeals,

> Statements against penal interest fall into three general categories: Some inculpate only the declarant (e.g., 'I killed Joe.'); others inculpate equally both the declarant and a third party, such as a co-defendant (e.g., 'We killed Joe.'); still others inculpate both the declarant and third party, but also shift blame by minimizing the speaker's culpability (e.g., 'We robbed the bank, and Dan killed Joe, the bank teller.'). A confession, conversation or narrative, even a short one, might mix together all three types of statements.

*Id*. at 891-92. And the court has expressly held that "[b]oth statements that are directly against the declarant's interest and collateral 'blame-sharing' statements may be admissible under Rule 803(24), *if corroborating circumstances clearly indicate their trustworthiness*." [Emphasis added]. *Id*. at 896 However, blame-shifting statements that "minimize the speaker's culpability are not, absent extraordinary circumstances, admissible under the rule." *Id*.

In regard to the first inquiry under *Walter*, Thomas's statement to Nieves that he "and some other dude," Little Boosie, had shot another individual, on its bare face, is a statement against penal interest that inculpates both the declarant, Thomas, and a third party, Little Boosie. However, given the vagueness of Nieves's testimony, it cannot be determined whether Thomas's statement inculpates both himself and Little Boosie equally. *See id*. Moreover, Thomas did not state who he shot, how he shot him, what he shot him with, when he shot him, or where he shot him. Nor did Thomas specifically explain Little Boosie's role in the shooting. Did Little Boosie merely "accompan[y]" Thomas to the shooting, as asserted by Appellant? Or did he play a more active

17

role by also shooting the individual? And although Nieves testified that Thomas actually "went into more detail about it," Appellant's trial counsel did not attempt to solicit from Nieves any further details about Thomas's statement. Perhaps because Nieves had clearly explained that he had already testified about "what [he] could remember."

Thus, in regard to the second inquiry under *Walter*, it is no wonder that the trial court, because it did not "know enough about the statement" or Nieves's "discussion with law enforcement," had a "problem with the reliability" of Thomas's statement. And, Appellant, in his briefing to this Court, does not direct us to any evidence in the record that establishes sufficient corroborating circumstances that clearly indicate the trustworthiness of Thomas's statement to Nieves. To the extent that the trial court excluded Nieves's testimony about Thomas's statement to him on the ground of hearsay as based on the unreliability of the statement, we conclude that the trial court did not abuse its discretion.

Accordingly, we hold that the trial court did not err in excluding the testimony of Nieves about Thomas's statement to him.

We overrule Appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

August 9, 2019

TERRY JENNINGS, Senior Judge

Before McClure, C.J., Palafox, J., and Jennings, Senior Judge
Jennings, Senior Judge (Sitting by Assignment)

(Do Not Publish)

18